# FREEPORT WATER COMPANY *v.* FREEPORT CITY.

ERROR TO THE SUPREME COURT OF THE STATE OF ILLINOIS.

No. 348. Submitted October 31, 1900.—Decided March 25, 1901.

The water company was a corporation organized under general statutes of Illinois, as was also the city. In June, 1882, the government of the city gave the water company an exclusive right to supply the city with water for thirty years, reserving the right of purchasing the works erected for that purpose, and if this right were not exercised, the rights of the company were to be extended for a further term. Provision was made for the erection of hydrants by the company for which fixed rentals were to be charged, and the city was given rights in a part of them. Further provisions were made for the payment of water rates by consumers. In 1896 an ordinance was passed by the city reducing the rentals of the hydrants and rates to consumers to take effect from the date of its passage. At the time when the grant of 1882 was made, a statute passed in 1872 was in force in Illinois, authorizing cities and villages to

contract with incorporated companies for a supply of water for a public use, for a period not exceeding thirty years. *Held*, that the power so conferred by the statute of 1872 in force in 1882 could, without straining, be construed as distributive; that the city council was authorized to contract with any person or corporation to construct and maintain waterworks at such rates as might be fixed by ordinance and for a period not exceeding thirty years; that the words "fixed by ordinance" might be construed to mean by ordinance once for all to endure during the whole period of thirty years, or by ordinance from time to time as might be deemed necessary; and that of the two constructions that must be adopted which is most favorable to the public, not that one which would so tie the hands of the council that the rates could not be adjusted as justice to both parties might require at a particular time.

THIS was an action of assumpsit brought by the plaintiff in error against the defendant in error in the circuit court of Stephenson County, State of Illinois, for the price of water delivered by plaintiff in error to defendant in error between January 1, 1896, and July 1, 1896.

The cause of action was based upon a contract arising from an ordinance passed by defendant empowering the plaintiff to construct certain waterworks in the city of Freeport and the renting from the plaintiff by the city of certain fire hydrants.

To the defences of a subsequent ordinance reducing the rental of such hydrants, it was replied that the latter ordinance impaired the obligation of the first ordinance as a contract, and therefore violated the Constitution of the United States.

The case was presented upon a demurrer to the pleas of the defendant. The demurrer was overruled by the circuit court, and the plaintiff electing to stand by its demurrer, judgment was entered for the defendant for costs. On appeal to the Supreme Court the judgment was affirmed, 186 Illinois, 179, and to that action this writ of error was directed.

The facts presented by the pleadings are as follows:

The plaintiff is a corporation organized and existing under the general laws of the State, and the defendant is a municipal corporation organized under the general act of the State, entitled "An act to provide for the incorporation of cities and villages," approved April 10, 1872, and in force July 1, 1872, and the acts amendatory thereof.

That on the 6th of June, 1882, defendant enacted an ordinance

giving and granting to Nathan Shelton or his assigns the exclusive right and privilege, for the term of thirty years from the 1st of July, 1882, to supply the city of Freeport and its citizens with water suitable for domestic and manufacturing purposes. The city reserved the right of purchasing the works at the end of thirty years. If such right should not be exercised the rights and privileges of the plaintiff were to be extended for a further period of twenty-five years. There were the usual provisions for the use of the streets, the character of the works and appliances, the quality of the water, and provision was made for the extension of the system as the growth of the city and its needs might require.

Section 7 of the ordinance was as follows:

"The said Nathan Shelton or his assigns shall erect double-nozzle fire hydrants upon all mains ordered laid by said city council in said city at the rate of not less than ten to each mile of said mains, and shall erect said fire hydrants whenever and wherever said city council shall direct. And said city shall pay to said Nathan Shelton or his assigns as an annual rental for the first one hundred of said hydrants the sum of one hundred dollars each, for all said hydrants over one hundred and up to one hundred and fifty an annual rental of eighty dollars each, and for all of said hydrants over one hundred and fifty an annual rental of fifty dollars each, which said rentals shall be payable semi-annually on the fifteenth days of January and July in each year, and the pay of each hydrant shall commence when each hydrant is actually ready for use and the city officially notified thereof, and shall continue during the full term specified in this ordinance, unless said city shall sooner become the owner of said waterworks as hereinbefore provided, in which event said rental shall cease. The pay of any hydrant shall cease whenever any hydrant is out of repair or unfit for use or incapable of throwing a stream as provided for in this ordinance."

The city was given the right to use water free of charge from the hydrants on streets curbed and guttered for flushing and washing the gutters, and from any hydrant, upon giving notice, for flushing any and all sewers; also water free of charge for the use of the fire department and for the city hall, public

offices, public schools, churches and for four public drinking fountains if the city should erect the same.

Maximum rates to consumers were fixed for purposes which were especially enumerated, and it was provided that "rents for other purposes not herein named will be fixed by meter measurement, as may be agreed upon between the consumer and the water company, not exceeding the following rates." The rates were specified.

Section 13 was as follows:

" This ordinance shall become binding as a contract between the city of Freeport, Illinois, and Nathan Shelton or his assigns, upon the filing with the city clerk of a written acceptance thereof by Nathan Shelton or his assigns, provided the same shall be done within thirty days from the passage and publication of this ordinance, and this ordinance when so accepted shall not be altered, amended or changed in any way without the concurrence and consent of both parties thereto and interested therein, or their successors or assigns."

On June 27, 1882, Shelton filed a written acceptance of the terms and conditions of the ordinance. On August 8, 1882, he assigned all his rights to plaintiff, of which defendant had notice. Plaintiff has complied with all things required of Shelton or of it, has constructed 121 hydrants as required by section 7 and as ordered by defendant, which were in operation on January 1, 1896, and defendant paid all rentals which became due January 1, 1896, and there was due for rentals subsequent to that date, and up to the 15th of July, 1896, the sum of $5840.

The pleas of the defendant in substance alleged that it was a municipal corporation organized under the general laws of the State for the incorporation of cities and villages, and that in pursuance of the statutes of the State relating to waterworks passed the ordinance of June 6, 1882.

It was alleged in plea No. 1 that the water rates fixed by such ordinance "were then unjust, unreasonable and oppressive to the citizens and taxpayers of said city, and so remained and continued to be unjust, unreasonable and oppressive from said enactment thereof up and until the subsequent action of the council of said city had in relation thereto. . . ." This

charge was substantially repeated in the other pleas, and it was alleged that the new rates were just and reasonable. The ordinance of February 11, 1896, was set out in full. The following is all that is necessary to be quoted :

"Sec. 1. That the Freeport Water Company, a corporation, now furnishing to the city of Freeport and its inhabitants water for fire protection, domestic uses and manufacturing purposes, and other uses and purposes, shall be entitled to charge and receive therefor, and for the use of water meters, the rates and prices hereinafter fixed and no more.

*"Fire Protection and Public Uses.*

"Sec. 2. Said corporation shall be entitled to charge and receive from the city of Freeport for all water furnished for fire protection and other public uses and purposes as hereinafter defined and enumerated an annual rental or rate of fifty dollars ($50.00) for each double-nozzle fire hydrant now in use in the said city of Freeport, or any that may be ordered hereafter by the city council of the city of Freeport, such rental to be payable in semi-annual instalments on the fifteenth (15th) day of January and July, provided that it shall be shown by a certificate signed by the committee on water, city engineer and chief of fire department that test of the works of said corporation has been made within six (6) months, and that such works have been in such condition as to furnish at all times and for any length of time a fire pressure sufficient to throw six (6) fire streams from six (6) hydrants chosen by the committee on water, each through fifty (50) feet of two and one-half inch hose and one inch nozzle from each hydrant so chosen to a height of one hundred (100) feet, or maintain its equivalent in pressure at the nozzles of the hydrants. Where the works of said corporation are not shown to be maintained in condition to furnish such fire pressure the rental shall be one-half the amount hereinbefore fixed. The above rate and rental shall be in full payment for all water, furnished as follows: For fire protection including the furnishing and setting of fire hydrants for all water used by the fire department in extinguishing fires and in practice, for all water used by the committee on water

for cleaning, washing, flushing gutters and sewers, in said city, and for all water used for the city hall, fire and police stations, and other city offices, for drinking fountain in park when desired, and for all public schools and churches in the city."

The ordinance further established in detail maximum rates for water to be furnished for domestic and manufacturing uses and other uses when furnished without meter; also rates when furnished or measured by meter. There was a penalty provided for charging greater rates than those established.

The ordinance was to take effect from the date of its passage, and the right of further regulation was reserved.

The rates established by the ordinance of February 11, 1896, were considerably less than those established by the ordinance of June, 1882.

The assignment of error presented the contentions in various ways that the ordinance of February 11, 1896, and the statutes in pursuance of which it was claimed to have been passed, violated the Constitution of the United States, in that the ordinance and statutes impaired the obligation of the contract made by the ordinances of June, 1882, with plaintiff, and deprived it of its property without due process of law.

The statutes of the State which are urged as applicable to the contentions of the parties are cited in the margin.[1]

*Mr. George C. Fry* and *Mr. James W. Hyde* for plaintiff in error.

*Mr. A. J. Hopkins* for defendant in error.

MR. JUSTICE McKENNA, after stating the case as above, delivered the opinion of the court.

---

[1] AN ACT to enable cities and villages to contract for a supply of water for public use, and to levy and collect the tax to pay for water so supplied. Approved April 9, 1872, in force July 1, 1872.

SEC. 1. Be it enacted by the People of the State of Illinois, represented in the General Assembly, That in all cities and villages where waterworks may hereafter be constructed by an incorporated company, the city or village authorities in such cities and villages may contract with such incorporated company for a supply of water for public use, for a period not exceeding thirty years. Public Laws of Illinois of 1871, p. 271.

The Supreme Court of the State based its decision on its opinions in the case of *Danville* v. *Danville Water Co.*, 178 Illinois, 299, and 180 Illinois, 235. In that case the same statutes were involved as in the case at bar, and the contract which was claimed was based upon a substantially similar ordinance to that involved in the pending controversy.

It is not clear from the opinion of the court whether it intended to decide that municipal corporations could not be invested with the power to bind themselves by an irrevocable contract not to regulate water rates. If so, we cannot concur in that view. We have decided to the contrary many times, and very lately in *Los Angeles* v. *Los Angeles City Water Co.*, 1900, 177 U. S. 558. See also *Walla Walla* v. *Walla Walla Water Co.*, 172 U. S. 1, 7, where the subject is more extensively discussed and the cases reviewed. See also *New Orleans Water Works Co.* v. *Rivers*, 115 U. S. 674.

We do not mean to say that if it was the declared policy of the State that the power of alienation of a governmental function did not exist, a subsequently asserted contract would not be controlled by such policy. In *Stevenson* v. *School Directors*, 87 Illinois, 225, 255, and in *Davis* v. *School Directors*, 92 Illinois, 298, it was held that a school board could not make a contract for the employment of teachers to extend beyond the current year and this was put upon the ground of the inability of one board to control the exercise of the functions of its successor. In *East St. Louis* v. *East St. Louis Gas Light & Coke Co.*, 98 Illinois, 415, decided in May, 1881, the doctrine of those

---

An act to provide for the incorporation of cities and villages. Approved April 10, 1872, in force July 1, 1872.

Sec. 1. The city council or board of trustees shall have power to provide for a supply of water by the boring and sinking of artesian wells, or by the construction and regulation of wells, pumps, cisterns, reservoirs or waterworks, and to borrow money therefor, and to authorize any person or private corporation to construct and maintain the same at such rates as may be fixed by ordinance, and for a period not exceeding thirty years; also to prevent the unnecessary waste of water; to prevent the pollution of the water, and injuries to such wells, pumps, cisterns, reservoirs or water works. Public Laws of Illinois of 1871, p. 259; 1 Starr & Curtis' Stat. p. 785, § 175.

cases was not adopted as applicable to a contract for gas rates, nor was it rejected. One Justice asserted it with great emphasis, quoting those cases. The court, however, left it disputable, placing the decision on other grounds. There was at least admonition in those cases to persons entering into contracts with municipalities. If there was anything more, we need not decide, as there are other grounds for judgment.

The Supreme Court did decide in the *Danville* case (1) that the water company having been incorporated under the general incorporation act of the State, approved April 18, 1872, the provisions of the act entered into and formed a part of its charter, and that by section 9 of the act (inserted in the margin,[1]) the right of the legislature to regulate and provide for the rates, at which the company should supply water to the city, was reserved; and (2) that the language of the act of April 9, 1872, and in force July 1, 1872, (inserted in the margin,[1]) did "not necessarily imply the power to make and fix rates." The court further said in 178 Illinois at page 309: "The authority 'to contract for a supply of water for public use for a period not exceeding thirty years' does not necessarily imply that the price of the supply should be fixed for the entire period. The supply could be made for the entire term, but the price is to be determined from time to time, and the rates to be settled by the rules of the common law. *Carlyle* v. *Carlyle Water, Light & Power Co.*, 52 Illinois App. 577."

---

AN ACT to enable cities, towns and villages incorporated under any general or special law of this State to fix the rates and charges for the supply of water furnished by an individual, company or corporation to any such city, town or village and the inhabitants thereof. Approved June 6, 1891, in force July 1, 1891.

SEC. 1. Be it enacted by the People of the State of Illinois, represented in the General Assembly, That the corporate authorities of the city, town or village, now or hereafter incorporated under any general or special law of this State, in which any individual, company or corporation has been, or hereafter may be, authorized by such city, town or village to supply water to such city, town or village and the inhabitants thereof, be and are hereby empowered to prescribe by ordinance maximum rates and charges for the supply of water furnished by such individual, company or corporation to such city, town or village and the inhabitants thereof, such rates

It is true that we do not necessarily have to follow this decision. When section 10, article 1, is invoked we decide for ourselves the fact of contract—not only its formal execution but its legal basis in law, and therefore construe for ourselves the statutes of the State upon which it is claimed to rest. In such case, we have also said, we are disposed to incline to agreement with the state court. These principles hardly need the citation of cases. They have become elementary. We may quote, however, the language of Mr. Justice Bradley in *Burgess* v. *Seligman*, 107 U. S. 20, 33. After stating the peculiarity of the existence of two coördinate jurisdictions in the same territory and the necessity for the exercise of mutual respect and deference to avoid anomalous and inconvenient results, and yet asserting the necessity in the Federal courts of the right to exercise an independent judgment, the learned Justice said:

" Since the ordinary administration of the law is carried on by the state courts, it necessarily happens that by the course of their decisions certain rules are established which become rules of property and action in the State, and have all the effect of law, and which it would be wrong to disturb. This is especially true with regard to the law of real estate and the construction of state constitutions and statutes. Such established rules are always regarded by the Federal courts, no less than by the state courts themselves, as authoritative declarations of what the law is. But where the law has not been thus settled,

---

and charges to be just and reasonable. And in case the corporate authorities of any such city, town or village shall fix unjust and unreasonable rates and charges, the same may be reviewed and determined by the circuit court of the county in which such city, town or village may be. Public Laws of Illinois of 1891, p. 85; 1 Starr & Curtis' Stat. p. 868, § 458.

Section 9 of the General Incorporation Act cited in the opinion is as follows:

The general assembly shall, at all times, have power to prescribe such regulations and provisions as it may deem advisable, which regulations and provisions shall be binding on any and all corporations formed under the provisions of this act: *And provided further*, That this act shall not be held to revive or extend any private charter or law heretofore granted or passed concerning any corporation. Section 9, Corporation Act; 1 Starr & Curtis' Stat. p. 1006.

it is the right and duty of the Federal courts to exercise their own judgment; as they always do in reference to the doctrines of commercial law and general jurisprudence. So when contracts and transactions have been entered into, and rights have accrued thereon under a particular state of the decisions, or when there has been no decision of the state tribunals, the Federal courts properly claim the right to adopt their own interpretation of the law applicable to the case, although a different interpretation may be adopted by the state courts after such rights have accrued. But even in such case, for the sake of harmony and to avoid confusion, the Federal courts will lean towards an agreement of views with the state courts if the question seems to them balanced with doubt. Acting on these principles, founded as they are on comity and good sense, the courts of the United States, without sacrificing their own dignity as independent tribunals, endeavor to avoid, and in most cases do avoid, any unseemly conflict with the well-considered decisions of the state courts."

Applying these principles to the case at bar, we solve its questions. The Supreme Court of the State in passing on the case not only considered the acts of the 9th and 10th of April, 1872, regarding municipalities, but also, as we have said, the general incorporation act of April 18, 1872. Under the latter the plaintiff was incorporated, and it was held that the act "must be regarded as entering into and forming part of the charter" of the plaintiff. The statute reserves to the general assembly the power to prescribe in the government of corporations "such regulations and provisions as it may deem advisable." The language is very comprehensive. Regarding it alone, it is difficult to conceive what objects of legislation are not covered by it. The Supreme Court of the State has construed it to be of greater import than the usual reservation of the power to alter and amend the charters of corporations.

The plaintiff, however, contends that it was not intended by the terms, " regulations and provisions," " to interfere with the internal business management of the corporation itself," but regulate " those classes of acts which control the relation existing between stockholders as individuals and the corporation as

an entirety, and the relations between corporations and third persons; that is, the manner of carrying on their business or exercising the powers of a corporation." We think the construction is too narrow. The statute made no distinction between the internal and the external business of corporations—between their relations to stockholders and their relations to third persons. Such are but special exertions of the power which the legislature possesses.

In *Beer Co.* v. *Massachusetts,* 97 U. S. 25, a provision was passed on of an act defining the general powers and duties of manufacturing corporations as affecting the beer company. The general statute was enacted in 1809, and the provision construed was as follows: " *Provided always,* that the legislature may from time to time, upon due notice to any corporation, make further provisions and regulations for the management of the corporation and for the government thereof, or wholly to repeal any act or part thereof, establishing any corporation, as shall be deemed expedient." The beer company was incorporated in 1828 " for the purpose of manufacturing malt liquors in all their varieties." It was held that the provisions of 1809 were adopted in the charter of the beer company, and were a part of the contract between the State and the company, rendering the latter subject to the exercise of that power; and the seizure and forfeiture of certain malt liquors, which were intended to be sold in violation of the prohibitory liquor law passed in 1869, were sustained.

But assuming that section 9 of the general incorporation act is correctly interpreted by plaintiff, we are brought to the question of the power of the city to make an irrevocable contract for thirty years, fixing water rates. The power is claimed under the statutes of 1872, heretofore quoted. The Supreme Court of the State, as we have seen, decided against the claim, and the principle of *Burgess* v. *Seligman* applies if the ruling of the court and the contention of the plaintiff is " balanced with doubt." There were no previous interpretations of the statutes by the state courts upon which the plaintiff had a right to rely. It acted upon the faith of the statutes alone, and committed its rights to a judicial interpretation of the statutes.

The rule which governs interpretation in such cases has often been declared. We expressed it, following many prior decisions, in *Detroit Citizens' Street Railway* v. *Detroit Railway*, 171 U. S. 48, to be that the power of a municipal corporation to grant exclusive privileges must be conferred by explicit terms. If inferred from other powers, it is not enough that the power is convenient to other powers; it must be indispensable to them.

In *Smith.* v. *McDowell,* 148 Illinois, 51, 62, the Supreme Court of the State expressed the rule as follows: "Their power [the power of municipal corporations] is measured by the legislative grant, and they can exercise such powers only as are expressly granted, or are necessarily implied from the powers expressly conferred."

The Supreme Court of the State applied these principles. It held that an irrevocable contract for specific rates was not indispensable to the other powers with which the cities of the State were invested. And a distinction was made between a contract which related to a governmental function, which the regulation of rates was said to be, and a contract which related to franchises which, though public in their nature, yet were not governmental, which the supply of water was said to be. This distinction, it was held, the statutes of 1872 observed, and gave the power to make one kind of contract but not the other—the power to contract for a supply of water, but not the power to contract "to pay a fixed and unalterable rate for thirty years." This was deduced from the silence of the statute of the 9th of April and the necessity of resolving all ambiguities in favor of the public. But ambiguity disappears, it was said, when the statute of the 9th was considered with the statute of the 10th, as it necessarily had to be, as the statutes were "*in pari materia,* and should be construed together." Section one of the act of the 10th of April "authorizes," the court said, "the city council to empower a private corporation to construct and maintain waterworks at such rates *as may be fixed by ordinance.* The meaning of this language is not that the waterworks are to be maintained at such established rate as may be fixed by one ordinance for a period not exceeding thirty years. The clause, 'for a period not exceeding thirty years,' qualifies the words

'construct and maintain the same,' but does not qualify the words 'at such rates as may be fixed by ordinance.'"

The statutes are certainly ambiguous, and in resolving the ambiguity in favor of the public the court applied the rule declared in many cases. We said in the *Railroad Commission Cases*, 116 U. S. 307, 325, by Chief Justice Waite, of the power of the regulation of rates :

"This power of regulation is a power of government, continuing in its nature, and if it can be bargained away at all it can only be by words of positive grant, or something which is in law equivalent. If there is reasonable doubt, it must be resolved in favor of the existence of the power. In the words of Chief Justice Marshall in *Providence Bank* v. *Billings*, 4 Pet. 514, 561, 'its abandonment ought not to be presumed in a case in which the deliberate purpose of the State to abandon it does not appear.' This rule is elementary, and the cases in our reports where it has been considered and applied are numerous."

These remarks are obviously applicable to the Illinois statutes. The question is whether the power given to the municipalities of the State was to be continuing or occasional, indeed only special in its purpose, intended to have but one exercise and then bound in contract for thirty years. If the latter had been the intention it would have been natural to express it. The fullness of sovereignty can be taken for granted, and naturally would be and should be taken for granted. An example is afforded by the act of June 6, 1891. By that act the corporate authorities of any city which have authorized or shall authorize any individual, company or corporation to supply water, "be and are hereby empowered to prescribe by ordinance maximum rates and charges for the supply of water furnished by such individual, company or corporation. . . ." There is no explicit provision for repetitions of the power—none declaring the power conferred a continuing one. Who now doubts that it is? If rights were claimed and were pleading for a different interpretation we might have to listen to them, but now undisturbed by them we yield without resistance to that meaning which the subject-matter demands in the absence of negativing words.

Our conclusion is that the powers conferred by the statutes of 1872 can, without straining, be construed as distributive. The city council was authorized to contract with any person or corporation to construct and maintain waterworks " *at such rates as may be fixed by ordinance, and for a period not exceeding thirty years.*" The words " *fixed by ordinance,*" may be construed to mean by ordinance once for all to endure during the whole period of thirty years; or by ordinance from time to time as might be deemed necessary. Of the two constructions that must be adopted, which is most favorable to the public, not that one which would so tie the hands of the council that the rates could not be adjusted as justice to both parties might require at a particular time.

It is also urged by plaintiff that the ordinance of February 10, 1896, deprives the plaintiff of its property without due process of law. The grounds of this contention are that (1) by the statute of June 6, 1891, none of the circumstances which, it is claimed, constitute a rate just and reasonable, are required to be considered by the authorities of cities nor is previous notice required to be given to the parties furnishing water; (2) establishing rates is a legislative, not a judicial act, and that, therefore, the power to review and determine them given by the statute to the circuit court is void; (3) the cities, towns and villages of the State are made judges in their own cases.

The first ground is answered by *San Diego Land & Town Co.* v. *National City,* 174 U. S. 739, 750, and we may say there is no question of the reasonableness of the rates. It was alleged in the pleas of the defendant that the rates of the ordinance of June, 1882, were unreasonable when established. This was conceded by the demurrer. It was alleged in the pleas that they continued unreasonable. This was conceded by the demurrer. It was also alleged that the rates established by the ordinance of February 10, 1896, were just and reasonable. This was also conceded. The allegations, therefore, must be accepted as true conclusions from investigation. And it was averred besides that " the plaintiff refused to treat " with a committee appointed by the city council, " and neglected to reduce or fix such rental and water rates so as to make them just, reasonable and fair."

JUSTICES WHITE, BREWER, BROWN and PECKHAM, dissenting.

Of the second ground it is only necessary to say that the statutes of 1872 gave to the city the power to fix the rates. It became a condition therefor of the privileges granted to plaintiff. The act of 1891 only repeated and emphasized the power.

The third ground urged why plaintiff is deprived of its property without due process of law is as abstract, as free from real grievance to plaintiff, as the other grounds. With what functions the circuit courts of the State may be invested may not be of Federal concern. It is also a matter of construction, in which we might be obliged to follow the state courts. The ground we are now reviewing seems not to have been presented to the Supreme Court of the State either in the case at bar or the cases referred to by it and upon which it based its opinion.

In *City of Danville* v. *Danville Water Co., supra,* the provision of the statute was referred to, but not in such way that it can be confidently said that the power given to the circuit court was to only review the rates fixed by the city council and to determine them to be reasonable or unreasonable, or whether the court could go farther and fix rates. The former seems a natural construction. But whether it is or not, the plaintiff has yet no reviewable grievance. No power has been attempted to be exercised by the circuit court against the plaintiff and no judicial remedy has been denied it.

*Judgment affirmed.*

MR. JUSTICE WHITE, with whom concurred MR. JUSTICE BREWER, MR. JUSTICE BROWN and MR. JUSTICE PECKHAM, dissenting.

The far-reaching consequences which must result from the principles upon which this case is decided, and the conflict between those principles and what I conceive to be previous well-settled rules of law, impel me to state the reasons for my dissent.

The legislature of Illinois, in 1872, passed a law entitled "An act to enable cities and villages to contract for a supply of water for public use, and to levy and collect a tax to pay for water supplied." The act in full is as follows:

"SEC. 1. *Be it enacted by the People of the State of Illinois,*

*represented in the General Assembly,* That in all cities and villages where waterworks may hereafter be constructed by an incorporated company, the city or village authorities in such cities and villages may contract with such incorporated company for a supply of water for public use, for a period not exceeding thirty years.

"Sec. 2. Any such city or village, so contracting, may levy and collect a tax on all taxable property within such city or village, to pay for the water so supplied."

This act was approved on April 9, 1872. Public Laws of Illinois, 1871–1872, p. 271.

At the same session, an elaborate law was passed entitled "An act to provide for the incorporation of cities and villages." Article X, under the heading "(Miscellaneous Provisions.)—Water," in section 1, provided as follows:

"Sec. 1. The city council or board of trustees shall have power to provide for a supply of water by the boring or sinking of artesian wells, or by the construction and regulation of wells, pumps, cisterns, reservoirs or waterworks, and to borrow money therefor, *and to authorize any person or private corporation to construct and maintain the same at such rates as may be fixed by ordinance, and for a period not exceeding thirty years;* also to prevent the unnecessary waste of water; to prevent the pollution of the water, and injuries to such wells, pumps, cisterns, reservoirs or waterworks."

This was followed, in subsections 2 and 3, by the granting of full power to municipal corporations, in the event they determined to construct their own waterworks, to acquire land, etc., to levy taxes, and to provide for the collection of water rates or assessments for the use of the water to be supplied to the inhabitants from the works to be constructed. This act was approved on April 10, 1872. Public Laws of Illinois, 1871–1872, p. 259.

At the same session an act was passed entitled "An act concerning corporations." It was in effect a general law regulating the organization of private corporations in the State of Illinois. Section 9 thereof, in part, reads as follows:

"Sec. 9. The general assembly shall, at all times, have power

to prescribe such regulations and provisions as it may deem advisable, which regulations and provisions shall be binding on any and all corporations formed under the provisions of this act. . . . "

This act was approved April 18, 1872. Public Laws of Illinois, 1871–1872, p. 299.

None of the foregoing acts contained an emergency clause; and, hence, although approved on different dates, each act went into force on the same day, viz., July 1, 1872. Constitution of 1870, Illinois, Art. IV, sec. 13; 1 Starr & C. Ann. Stat. (2d ed.) p. 125.

The defendant in error, the city of Freeport, a municipal corporation, on June 6, 1882, enacted an ordinance giving Nathan Shelton or his assigns the right of constructing, maintaining and operating waterworks for the term of thirty years from the first day of July, 1882, for the purpose of furnishing fire protection to and for the supply of said city of Freeport and the inhabitants thereof with water suitable for domestic and manufacturing purposes. The ordinance consisted of fourteen sections. It provided for a stand pipe, that the pumping machinery should possess a capacity of at least three million gallons of water in twenty-four hours, to be increased as the growth of the city and its needs required, and that not less than eight miles of mains, of specified dimensions and quality, should be laid for the distribution of water. Ample provision was also made for the extension of these mains by the water company, at its cost, upon the direction of the city government. The obligation was further imposed upon Shelton or his assigns to erect double-nozzle fire hydrants at the rate of not less than ten to each mile of main pipe, whenever and wherever the city council should direct. Payment was to be made by the city for fire hydrants by an annual rental for the first one hundred of one hundred dollars each, for all said hydrants, over one hundred and up to one hundred and fifty, an annual rental of eighty dollars each, and for all said hydrants over one hundred and fifty, an annual rental of fifty dollars each. It was expressly provided, in section 8 of the ordinance that the hydrant rentals " shall continue during the full term specified in this ordinance,

unless said city shall sooner become the owner of said water-works as hereinbefore provided, in which event said rental shall cease." By section 6 the city reserved to itself the right to acquire the waterworks by purchase at the expiration of thirty years from July 1, 1882, the valuation of the property to be determined as provided in the section.

The ordinance contained provisions for the use of water "free of charge from the hydrants on streets curbed and guttered, for the purpose of washing and flushing the gutters, and from any hydrant for the purpose of flushing any and all sewers in said city whenever the city council shall deem it necessary for sanitary purposes, upon giving notice to the person in charge of said waterworks." It was also provided that "the city shall have water free of charge for the use of the fire department, and for furnishing the city hall and the offices occupied for city purposes, for all public schools of the city, for all churches, and for four public fountains for drinking only, and one fountain in the public square or park should the city erect the same." Full specifications were contained in the ordinance as to the maximum charge to be made for water to be furnished individual consumers. In other words, the ordinance formulated a complete system, not only for the construction of the works, but for their operation during the time specified therein.

It was provided that the ordinance should become a binding contract upon its acceptance in writing by Shelton within a stated time, and when so accepted its provisions should not be changed, altered or amended in any way without the consent of both parties thereto or their successors or assigns.

On June 27, 1872, within the time limited, Shelton filed his written acceptance of the contract. In the following August he assigned all his rights to the plaintiff in error, a corporation organized under the provisions of the general statute relating to private corporations, approved April 18, 1872, above referred to. The assignment was recognized by the municipality, and it is unquestioned that the works were constructed in accordance with the contract, and that all obligations which it imposed were discharged by the company to the satisfaction of the municipality.

Up to January 1, 1896, under the contract, one hundred and twenty-one hydrants were placed in position, and up to that date the annual rental as provided in the contract was regularly paid by the municipality.

In 1891 an act was passed by the legislature of the State of Illinois entitled "An act to enable cities, towns and villages incorporated under any general or special law of this State to fix the rates and charges for the supply of water furnished by any individual, company or corporation to any such city, town or village and the inhabitants thereof." Briefly stated, this act, as its title indicated, empowered municipal corporations to prescribe by ordinance "maximum rates and charges for the supply of water furnished by such individual, company or corporation to such city, town or village and the inhabitants thereof, such rates and charges to be just and reasonable." The act moreover provided that the reasonableness of the rates prescribed by the municipality might be tested by proceedings before a designated court.

Availing itself of the power conferred by this statute, the city of Freeport on February 11, 1896, passed an ordinance reducing the rates stipulated to be paid under the contract of 1882. It is necessary, however, only to consider, for the purposes of this case, the reduction made on the contract price for the public hydrants. At the reduction they were to be paid for annually at the uniform rate of fifty dollars each. Whilst thus seeking to reduce the sum which the city was to pay for the hydrants, the ordinance in effect retained all the contract obligations for the benefit of the city resting upon the water company, among them being the duty to lay additional mains as directed and to furnish free water for schools, churches and other purposes. The city refusing to pay any longer for the hydrants at the original contract price, an action was instituted to recover an amount asserted to be then due under the contract. Without stating the form of pleadings, it suffices to say that on the one hand the right of the water company to recover according to the rates fixed by the original contract was asserted and on the other the obligation of the city to pay only at the reduced rates was alleged. It was expressly charged in the pleadings on be-

half of the water company that the enforcement of the ordinance reducing the rates would be an impairment of the obligations of the contract, and hence a violation of the contract clause of the Constitution of the United States.

The case was ultimately taken to the Supreme Court of Illinois, and, upon the authority of the analogous case of *City of Danville* v. *Danville Water Company*, 178 Ill. 299, judgment went in favor of the city and against the water company. 186 Ill. 179. The opinion of the court in the *Danville* case was not unanimous, three of the seven judges dissenting. Without attempting to reproduce in its details the reasoning by which the court reached its conclusion, it seems to me that all the views expressed are embodied in the following propositions :

That the fixing of water rates was a public attribute, which from its nature was incapable of being alienated or restrained by the obligations of a contract, even although express authority to do so was conferred by the legislature on the municipality. That even if this was not the case, to contract for rates to be paid for a definite term required authority of the legislature, and that no such grant to the municipality had been conferred in this case, because, albeit, the legislative acts gave power to contract for a definite time for a supply of water, this did not give the right to fix the rates to be paid for the water during the time for which the municipality was authorized to contract; the argument being that the power to contract for a definite time is one thing and the fixing of the rates for the same time for the water contracted for is another and different thing. That even under the hypothesis that the power to contract for a definite time included the authority to fix the rates for such time, the reservation found in the general private incorporation law operated to confer upon the legislature the right to change the rates, because the contract, although originally made by the city with an individual, had been assigned to the defendant, a private corporation organized under the general private incorporation law.

These propositions practically embrace all but one of the contentions urged in the argument at bar, and their consideration will therefore substantially dispose of the controversy, except in

Justices White, Brewer, Brown and Peckham, dissenting.

the particular above referred to, which we shall separately notice before concluding. Inverting the order in which they have been stated, I come to consider their correctness. In logical sequence the questions which arise are these: Was there power in the legislature to confer upon the municipality authority to contract for water for public use and fix by contract the rates to be paid by the city for a stated period? If so, was such power conferred upon the municipality, and did it contract under it? If it did so, was the contract to that effect taken out of the protection of the contract clause of the Constitution of the United States by reason of the reservations contained in the general private incorporation law under which the water company was organized?

It is not even intimated in the opinion below that there was any express limitation in the constitution of the State of Illinois restricting the power of the legislature to authorize a municipality to contract for water for public use for a fixed period and to agree upon the rates to be paid therefor for such time. That in the absence of such restriction the legislature of a State may contract, by statute, or may empower a municipality to contract for water for public use for a stated period and fix the rates to be paid during such term for the same, and that such contract if made is protected from impairment by the Constitution of the United States, is no longer an open question. *New Orleans Water Works Company* v. *Rivers,* 1885, 115 U. S. 674.

In that case the exclusive right granted was to continue for fifty years, and the act which it was held constituted a contract stipulated for the furnishing of a supply of water for public use during the continuance of the contract, " in consideration whereof the franchises and property of the company, used in accordance with its charter, were exempted from taxation, state, municipal and parochial." p. 677. After observing that the case before the court was controlled by the decision in *New Orleans Gas Company* v. *Louisiana Gas Company,* 115 U. S. 650, the court, speaking through Mr. Justice Harlan, said (p. 680):

" The two are not to be distinguished upon principle; for, if it was competent for the State, before the adoption of her present constitution, as we have held it was, to provide for supply-

ing the city of New Orleans and its people with illuminating gas by means of pipes, mains and conduits placed at the cost of a private corporation, in its public ways, it was equally competent for her to make a valid contract with a private corporation for supplying, by the same means, pure and wholesome water for like use in the same city."

In the *Gas Company* case, beginning at page 660, the court considered and held untenable the contention "that, as the supplying of New Orleans and its inhabitants with gas has relation to the public comfort, and, in some sense, to the public health and the public safety, and, for that reason, is an object to which the police power extends, it was not competent for one legislature to limit or restrict the power of a subsequent legislature in respect to those subjects." After reviewing various decisions bearing upon this feature of the case, the court said (p. 664):

"Numerous other cases could be cited as establishing the doctrine that the State may by contract restrict the exercise of some of its most important powers. We particularly refer to those in which it is held that an exemption from taxation for a valuable consideration at the time advanced, or for services to be thereafter performed, constitutes a contract within the meaning of the Constitution. *Asylum* v. *New Orleans*, 105 U. S. 362, 368; *Home of the Friendless*, 8 Wall. 430; *New Jersey* v. *Wilson*, 7 Cranch, 164, 166; *State Bank of Ohio* v. *Knoop*, 16 How. 363, 376; *Gordon* v. *Appeal Tax Court*, 3 How. 133; *Wilmington Railroad* v. *Reid*, 13 Wall. 264, 266; *Humphrey* v. *Pegues*, 16 Wall. 244, 248–9; *Farrington* v. *Tennessee*, 95 U. S. 679, 689."

The doctrine of the cases just cited was applied in *St. Tammany Waterworks* v. *New Orleans Waterworks*, 120 U. S. 64. It was also recognized and applied in *Walla Walla* v. *Walla Walla Water Co.*, 172 U. S. 1, 9. In that case the court held valid a stipulation contained in a contract with the water company by which the city of Walla Walla bound itself not to erect waterworks during the stipulated life of a contract, viz., twenty-five years. Speaking of the earlier decisions to which we have above referred, the court, speaking through Mr. Justice Brown, said (p. 9):

" It is true that in these cases the franchise was granted directly by the state legislature, but it is equally clear that such franchises may be bestowed upon corporations by the municipal authorities, provided the right to do so is given by their charters. State legislatures may not only exercise their sovereignty directly, but may delegate such portions of it to inferior legislative bodies as, in their judgment, is desirable for local purposes. As was said by the Supreme Court of Ohio in *State* v. *Cincinnati Gaslight & Coke Co.*, 18 Ohio St. 262, 293 : ' And, assuming that such a power' (granting franchises to establish gas works) ' may be exercised directly, we are not disposed to doubt that it may also be exercised indirectly, through the agency of a municipal corporation clearly invested, for police purposes, with the necessary authority.' This case is directly in line with those above cited. See also *Wright* v. *Nagle*, 101 U. S. 791; *Hamilton Gaslight & Coke Co.* v. *Hamilton City*, 146 U. S. 258, 266 ; *Bacon* v. *Texas*, 163 U. S. 207, 216; *New Orleans Waterworks Co.* v. *New Orleans*, 164 U. S. 471. . : ."

" Where a contract for a supply of water is innocuous in itself, and is carried out with due regard to the good order of the city and the health of its inhabitants, the aid of the police power cannot be invoked to abrogate or impair it."

That a city if authorized by the legislature, in the absence of limitations in the state constitution on the legislative power, could validly stipulate in a contract for a supply of water that the existing rates should not be *reduced* by the municipality during the contract period, was expressly adjudged in the recent case of *Los Angeles* v. *Los Angeles City Waterworks Co.*, (1900) 177 U. S. 558. Indeed, in that case, at the time the contract was made, the city was without authority to make it, but inasmuch as subsequently its action had been ratified by legislative enactment the effect of such ratification was held to be equivalent to a prior original grant. But I need not further pursue this aspect of the case, since, as I understand the opinion of the court, it does not sanction the theory adopted by the Supreme Court of Illinois on this subject, and hence does not therefore in terms overrule the principle so firmly settled by the previous decisions of this court that the subject-matter of a water supply

may be contracted for a definite time, and that when so contracted for the obligations of the contract are protected from impairment by the Constitution of the United States.

That in the present case some authority was delegated by the legislature to the municipality to contract for water is unquestioned, and it is also undisputed that under the right thus conferred the municipality acted in making the contract which is now in controversy. The issue which then arises is simply this, Did the authority conferred by the legislature upon the municipality authorize it to contract, and in doing so to fix the rates to be paid for such supply during the time stated? Of course, an answer to this question involves an analysis of the statutes of Illinois under which the authority to make the asserted contract arises.

Before approaching the text of the statutes it is well to state the scope of the duty which devolves upon this court in determining whether there was a contract and the principles which must control in doing so. It is elementary that where a contract is asserted to have been impaired by subsequent state legislation, this court is constrained to form an independent judgment as to the existence of the contract and its terms. It is equally true that where the contract originates from a state statute, if, in the exercise of an independent judgment, the existence or nature of the contract becomes balanced in doubt, such doubt will be resolved in favor of the construction given to the state statute by the court of last resort of the State. But this qualification is not a limitation upon the duty to form an independent judgment, and does not imply that because the statute has been construed against the contract by the state court, therefore the matter is " balanced in doubt." If the rule did so imply, it would follow that in every case where a right arose from a state statute, and the court below held there was no contract, the review of that question in this court would be wholly nugatory, since the decision below would engender the doubt, and where doubt arose the decision of the state court would have to be followed. The rule then to be applied when the matter is balanced in doubt is this and nothing more, that if in using its independent judgment, as it is its duty to do, a

JUSTICES WHITE, BREWER, BROWN and PECKHAM, dissenting.

serious doubt arises in the mind of the court, then the interpretation by the state court, acting upon a serious doubt created by the exercise of independent judgment, will cause such judgment to preponderate in favor of the construction given by the state court to its own statute. *Board of Liquidation* v. *Louisiana*, 179 U. S. 622, 638.

It is unquestioned also that where a right asserted if enforced will put a contractual limitation upon the power of the lawmaking authority of a State, presumably to be exercised for the public benefit, doubt is to be resolved in favor of the continued existence of the lawmaking power. In other words, that no contract limitation on the powers of government can be upheld by mere implication or sustained if there be doubt on the subject. The existence of such a contract limitation must arise clearly and by express intendment.

Bearing these principles in mind, I come to consider the legislative acts by which it is asserted the contract in question arose. Whilst it is quite clear to my mind that the powers conferred by the respective statutes were to be exerted under different circumstances and that the contract which is here in question came more especially within the scope of the act approved April 10, 1872, I shall not stop to discuss this view, since, whether the statutes be treated separately or together, they fully authorize the contract. Under this view I first approach the consideration of the act of April 9, 1872. Its language is that in all cities and villages where waterworks may hereafter be constructed, the city or village authorities " may contract . . . for a supply of water for public use for a period not exceeding thirty years." And the second section conferred upon a municipality so contracting power to levy taxes " to pay for the water so supplied." Clearly, authority is expressly conferred to contract for a supply of water for the period stated. The argument is that this right to contract for the water for the period of thirty years did not include the power to agree upon the sum to be paid for it for that period. In other words, the contention is that the right to contract for the purchase existed for the stated period without the power to fix the price which was an inseparable and necessary concomitant of the right itself.

This inevitably follows, since the contract for the supply for a fixed time and the payment to be made for it are one and each the correlative of the other. That the statute contemplated that the contract should include the price to be paid is manifestly the result of the second section, which confers upon the municipality the right to raise by taxation the money to pay the sum stipulated. Upon the hypothesis that the power to contract for the supply for thirty years did not include the agreement to pay for the supply during the stated period, the second section of the act would become wholly superfluous. Indeed, the theory of construction which excludes the rates from the power to contract for the period specified would render the whole act meaningless. Undoubtedly, if waterworks existed and use was made of the streets of the city by the owner of the works, in the absence of contract the power to compel the furnishing of water at just and reasonable rates would exist by operation of law. It follows that the statute should not be construed as merely authorizing the doing of that thing which could have been done without its passage, but must in reason be held to have empowered the obtaining of a water supply and facilities by way of extension of the water system, free water for certain public purposes and fire protection and all the other incidents to such contract, for the period named and at the rates to be agreed upon for such period. The same view obtains from considering the provisions of the first section of Article X of the act of April 10, 1872. By this section municipal authorities were authorized to provide for a supply of water by constructing municipal waterworks, or to accomplish the same purpose by authorizing " any person or private corporation to construct and maintain the same at such rates as may be fixed by ordinance and for a period not exceeding thirty years." There was here an express delegation of authority to municipalities if they did not wish to assume the burden of constructing their own waterworks, to contract with an individual or private corporation to construct and maintain them at " *such rates as may be fixed by ordinance and for a period not exceeding thirty years.*" My mind fails to perceive how language could more directly and positively confer the authority to contract for the supply

and agree as to the rates to be paid therefor for a period of thirty years. Adopting the most technical rules of construction, I do not understand how the words " at such rates as may be fixed by ordinance and for a period not exceeding thirty years " can be construed as relating to the construction and maintenance of the works for that period and not to the sum to be paid for the supply for the same length of time. The view adopted by the court below was the words " at such rates as may be fixed by ordinance " can be taken out of the text and be treated as following and not as preceding the words " and for a period not exceeding thirty years." But this, as I understand it, instead of construing the statute, would be the equivalent of writing a new one. Obviously, whilst the statute authorized a contract for a supply and the rates to be paid therefor, it contemplated that the rates must in the nature of things be fixed by the passage of an ordinance to be embodied in the contract, and therefore the words " may be fixed by ordinance " were inserted. In other words, in order to insure under the contract the rates to be agreed upon, it provided that by ordinance these rates should be fixed for the designated period. Both laws, as I have stated, went into effect on the same day, but whilst relating to cognate subjects, contemplated the exercise of the power conferred as a result of somewhat different conditions. The one, the law approved April 9, had in view a contract for a water supply to be made where waterworks were established, and conferred the authority to contract for such supply under such circumstances and to fix the price to be paid for the supply for the contract term specified in the statute. The other, the law approved April 10, 1872, authorized a contract *to procure the construction of waterworks,* and also in doing so to fix the rates for the definite period which that statute likewise enumerated. To construe the words " *may be fixed by ordinance and for a period not exceeding thirty years,*" as found in the statute as a legislative prohibition on the municipality to fix rates for the period stated in the law, is but to say that the power to contract and fix the rates for the definite time was at one and the same identical moment both given and prohibited.

But the construction adopted below and now maintained by

the court, as I understand it, leads yet further. As the words "may be fixed by ordinance and for a period not exceeding thirty years" are not found in the law authorizing a contract for water supply where waterworks were established when the agreement was made, they cannot be applied to such a contract. The following, then, is the inevitable result of the construction given to the statutes. The power to contract and fix rates for a definite time was conferred in the case where such a contract was made with an established water company. This power, however, was not given but was expressly prohibited where the purpose of the contract was to procure the building of waterworks and the purchase of a supply of water to be furnished from the works when constructed. This is but to say that where municipalities were legally entitled to secure the water supply without the necessity for a contract and at reasonable rates, they were unauthorized to contract for a definite time and at rates to be fixed for that period. But in the case where municipalities had no such power (for they could not, of course, compel an individual or corporation to undertake the expense of erecting waterworks) the power to fix rates for a definite period was absolutely prohibited. In other words, the power was conferred to contract for the supply and fix the price for a definite time where it was not at all needed, and it was absolutely forbidden in the case where in the nature of things such a power was essential. Considering the statutes separately, no doubt whatever then arises in my mind as to their import. When they are construed *in pari materia* this conclusion becomes to me an absolute conviction. This must be the result, since it is impossible, in reason, to hold that if the meaning of each statute is plain when considered separately the significance of each disappears when they are considered together.

The contract as executed, beyond peradventure, expressly fixed the rates for the term for which it was agreed the supply should be furnished. It imposed, moreover, upon the water company duties to construct and extend the works, which could only arise from contract, and which cannot reasonably be assumed to have been entered into but upon the basis of an agreed compensation. The obligations on the water company were not

simply to furnish a supply of water in accordance with the capacity of the plant existing at the inception of the contract, or provided for therein, but that the company came under the duty of largely extending its plant at the discretion of the municipality during the statutory period covered by the contract. The company, moreover, agreed to furnish a large volume of water during the same period without charge. It is inconceivable that all these obligations would have been assumed upon the hypothesis that they were to be performed during the thirty years without any previous understanding or agreement as to the payment to be made during the same time.

Various authorities are cited in the opinion of the court below, and were referred to in argument, upon the theory that they support the contention that where authority is given to contract for a supply of water for a fixed period, this power to contract does not as a necessary incident import authority to also agree upon the rates for the same period. In other words, the authorities cited, it is contended, separate the inseparable.

All the authorities cited are excerpted in the margin.[1] I do not pause to analyze them, contenting myself with the statement that not a single one of them, except the decision of a lower appellate court in Illinois, rendered subsequent to the execution of the contract here considered, have any relation to the proposition which they are cited to maintain. They all proceed upon the theory that where authority is given to a municipality or official board to contract, *without any specification of the time,* the municipality or board can contract only for a reasonable period, to be determined usually by the tenure of office of the official board. That is, *in the absence of a specification of time in the statute,* a limit is to be implied resulting from the nature of the

---

[1] *Carlyle* v. *Carlyle Water, Light & Power Co.,* 52 Ill. App. 577; *East St. Louis* v. *East St. Louis Gaslight & Coke Co.,* 98 Ill. 415; *Millikin* v. *Edgar County,* 142 Ill. 528; *Gale* v. *Kalamazoo,* 23 Mich. 354; *Des Moines Waterworks Co.* v. *Des Moines,* 95 Iowa, 357; *Spring Valley Waterworks* v. *Schottler,* 110 U. S. 347; *State* v. *Columbus Gaslight & Coke Co.,* 34 Ohio St. 572; *Zanesville* v. *Gaslight Co.,* 47 Ohio St. 1; Greenh. Pub. Pol. p. 317; Cooley, Const. Lim. p. 206; 1 Dill. Mun. Corp. sec. 443.

functions of the officials by whom the contract is made. I cannot conceive upon what principle these authorities are held to control a case where in the statute conferring authority *the time was expressly fixed.* Indeed, the decisions in Illinois, (among them not only the cases cited below, but others which were referred to in those cases,) which are now relied upon to sustain the proposition that a power to contract for a supply of a commodity or the services of an individual does not include the authority to agree upon the compensation to be paid, actually refute the contention which it is alleged they sustain. Thus, in *Millikin* v. *County of Edgar,* 142 Ill. 528 ; *Davis* v. *School Directors,* 92 Ill. 294, and *Stevenson* v. *School Directors,* 87 Ill. 255, though it was held, from a consideration of co-related statutes, that where authority was conferred upon statutory boards to employ individuals to render public services, but no period was mentioned in the statute for the duration of such hiring, a contract of hiring might only lawfully be made for the current year, it was conceded that the power existed as a necessary result of the right to contract, to fix the compensation for such period. These cases demonstrate the unsoundness of the contention, here asserted, that the contract under consideration should be dismembered by disassociating the right to fix rates from the authority to contract for the period authorized by statute, and they also, in my opinion, refute the assumption that because the statute gave express power to fix rates by ordinance, thereby there did or could arise a limitation on the authority to contract for the price for the term for which the contract was authorized.

The contract in its entirety being then valid, the question which arises is, Did the power to destroy the contract arise from the reservation contained in the general private incorporation law ?

In considering this question it must be borne in mind that there was no reservation whatever of the power to repeal, alter or amend contained in the law regulating public corporations, nor was such a reservation found in the constitution of the State. The power conferred upon municipalities to contract for a supply of water or for the construction of waterworks

authorized them to contract with individuals as well as corporations, and in this particular instance the contract was made with an individual.  It is clear, then, that any reservation in the private incorporation act would not have acted upon the contract for the supply of water if that contract had remained in the hands of an individual.  To hold, then, that the provision of the ninth section of the law regulating private corporations, which reserved to the general assembly the power to prescribe such regulations and provisions as it might deem advisable as to such corporations, retained the power to abrogate a contract like the one here involved, would import that, although there was no reservation whatever to abrogate or change the contracts as to water supply, made by a municipal corporation, that the private incorporation law was intended to deprive private corporations of the power to contract with municipal corporations as to water supply.  That is to say, that public corporations were fully authorized to make irrevocable contracts, but such agreements became revocable when a private corporation was the other contracting party.  But, aside from these considerations, the views of the contract, which I have already expressed, to my mind clearly demonstrate the inapplicability of the reservation relied upon.  The reservation, as I have shown, went into effect on the same day as did the laws which expressly and specifically authorized the making, by municipal corporations, of a contract for a supply of water for a designated period *with individuals* or corporations.  The statutes having gone into effect upon the same day, it would be beyond reason to construe the mere reservation of the legislative right to regulate private corporations as abrogating and destroying the express legislative authority to contract for a supply of water for a specified and definite period.  To do so would be, by a mere implication, in effect to repeal and set aside the express authority conferred by the statutes, and would amount to holding that the authority had been conferred in the one breath and had been retracted in the other.

Indeed, the statute of 1891 which conferred the power to regulate water rates—under the authority of which the ordinance here complained of reducing the rates, was passed—shows

on its face that it was not enacted under the authority to regulate private corporations but upon the supposed existence in the legislature of a common-law right to fix rates, any contract to the contrary notwithstanding. This will become manifest when it is observed that the statute in question authorized municipalities to fix the rates for the supply of water, whether furnished by *private individuals* or corporations.

Although no reference was made to it in the opinion below, it is suggested in argument that as there was a provision in the constitution of the State of Illinois forbidding a grant of exclusive privileges, therefore the contract here considered was void because, it is asserted, such contract expressly conferred an exclusive right and privilege. It is, however, settled that the mere making of a contract for a water supply for a definite time and the fixing of rates for such time, accompanied with an obligation that the municipality itself would not construct waterworks for such period, does not amount to a grant of an exclusive privilege. *Walla Walla* v. *Walla Walla Water Co.,* 172 U. S. 1, 14, 17. This being beyond question, it clearly follows that even upon the hypothesis that the contract in this case contained an express or implied stipulation that the city would not grant to any one else the right to use the streets of the city for the purposes of a waterwork system during the life of the contract, the stipulation for such exclusive right and not the contract would come within the inhibition of the provision of the constitution. We say this *arguendo* only, as the controversy here presented involves the validity of the contract in so far as it affected the supply for public use and fixed the rates of such supply during the period stated.

In my opinion, the contract having been expressly authorized for a definite period, the rates agreed upon could not, during the term of the contract, be changed without violating the contract clause of the Constitution of the United States; and I therefore dissent from the judgment holding otherwise.