[No. 8542.]

## DENVER & SOUTH PLATTE RAILWAY CO. v. CITY OF ENGLEWOOD.

1. MUNICIPAL CORPORATIONS—*Power of Town in Granting a Franchise in the Streets.* A town organized under the general law is not empowered by Rev. Stat., sec. 6676, to prescribe the rates which a street railway company occupying the street under a franchise of the town may exact for its service. Whether the rule is the same in the case of a municipality organized under article XX of the constitution, is not decided. (233, 234.)

2. UTILITIES COMMISSION—*Powers*. Under c. 127 of the Acts of 1913, the Public Utilities Commission are entrusted with the supervision and regulation of all services rendered by the persons and corporations therein referred to, throughout the state—including rates and regulations established by previous contract. (236.) GABBERT, C. J., and TELLER, J., dissent.

3. ——*Remedy for Errors of the Commission*. Every order or decision of the condition may be reviewed by the Supreme Court, under the provisions of the act. An equitable action to restrain the enforcement of the order complained of will not lie. (241.)

*Error to Arapahoe District Court.* Hon. H. S. CLASS, Judge.

Mr. W. H. CALEY, and Mr. F. W. VARNEY, for plaintiff in error.

Mr. R. H. BLACKMAN, and Messrs. CRUMP & ALLEN, for defendant in error.

Hon. FRED FARRAR, Attorney General, Mr. FRANK C. WEST, Assistant Attorney General, and Mr. M. H. AYLESWORTH, for the Public Utilities Commission.

Mr. JUSTICE SCOTT delivered the opinion of the court.

This is an action in injunction and the issue was determined in the pleadings. There is no dispute as to the facts.

The complaint alleges that the City of Englewood, defendant in error, on the 6th day of December, 1906, and while it was an incorporated town, by ordinance granted to the grantors of The Denver and South Platte Railway Company, defendant in error, a franchise for the operation of a street railway upon and across certain of its streets. That section 6 of said ordinance fixed the rates of fares to be charged within said city, and further, provided by reasonable regulation for the sale of coupon tickets, which shall entitle passengers taking passage on the cars of said grantees, their successors or assigns, going north on said Broadway, at or north of

Quincy Avenue, to be transported the same as regular Tramway passengers, without extra fare, upon the cars of the Denver City Tramway Company at Hampden Avenue; and, also entitling passengers going south, on the cars of said grantees, to the intersection of any street between Hampden and Quincy Avenues, the latter inclusive avenue, without additional fare, upon presentation of said coupon ticket.

It was further alleged, "That at the time of the passage of said ordinance, and the granting of said franchise to the grantors of the said defendant, the Denver City Tramway Company was engaged in operating a street railway as a common carrier between the city of Denver and the said Hampden Avenue, at the intersection of said Hampden Avenue and Broadway, in the said City of Englewood, and that thereafter the defendant company did, until on or about the 28th day of October, A. D. 1914, substantially comply with the terms and conditions of said section six of said ordinance, and for some years thereafter did in fact provide for those seeking passage upon the cars of the said The Denver City Tramway Company, without extra charge as provided in section six of said ordinance."

It is then alleged that since the said 28th day of October, 1914, the defendant has refused to comply with that provision of the ordinance in the matter of providing the sale of coupon tickets entitling passengers to transportation to and from the city of Denver, on the line of the Denver Tramway Company, as provided by the terms of the ordinance.

The prayer was for injunction to compel the enforcement of the terms of the ordinance in the particular respect.

The answer of the defendant company, admits the ordinance and the terms thereof, and alleges that from the date of the passage of the ordinance up to October

28th, 1914, the defendant had given and tendered to all persons seeking passage on its cars between the point complained of, free service and transfers entitling passengers to passage between such points.

The answer further alleges that the defendant has sought to make arrangements with the Denver Tramway Company for the transfer of passengers taking passage upon its lines, between the points set out in the complaint, and that the only provision it has been able to make is that the Denver Tramway Company shall receive five cents from all passengers so transferred and transported.

It is then alleged that the defendant is a public utility, and subject to the provisions of the Public Utility Law, and further, that:

"Pursuant to the provisions of law in such cases made and provided it did file with the Public Utilities Commission of the State of Colorado, its schedule of rates and that its schedule of rates so filed were not suspended by the said Public Utilities Commission herein upon its own motion, or upon the complaint of others for a period of thirty days; and that thirty days expired from the time of filing the same and from the 28th day of September, A. D. 1914, and until the 28th day of October, A. D. 1914; and thereupon and pursuant to law, the said rates did on the 28th day of October, A. D. 1914, go in effect and become and are now the established effective fares and charges, practices, rules and regulations of this defendant company."

It is then said in substance, that to comply with the ordinance in the matter complained of, it must violate the Public Utility Law as relates to the prohibition of free service, or free transportation.

Further, that the plaintiff and all others who may claim to be injured by reason of the premises, have a

plain, speedy and adequate remedy at law under the Public Utilities Law of the State.

To this answer the plaintiff filed a demurrer, upon the ground that the same does not constitute a sufficient defense to the complaint. The court sustained the demurrer, and the defendant electing to stand upon its answer, judgment was rendered in accordance with the prayer of the complaint. This judgment is before us for review.

It will be seen that the defendant company contends that its present rates of service are those fixed by the State Public Service Commission in due compliance with the statute creating such commission and prescribing its powers and duties, and the first question therefore presented in this particular, is, may the commission alter a rate or regulation, fixed by a franchise ordinance prior to the enactment of the Public Utilities Law.

It must be conceded that the ordinance and the acceptance thereof, constituted a contract, which the city and the company, were at the time, empowered to make. If the contract is now an enforcible one, the present action in equity was proper.

The city of Englewood was at the date of the ordinance a town operating under the general law of the state, as appears from the pleadings. Its sole power to enact such an ordinance was in section 6676, Rev. Stat. 1908, as follows:

"No franchise or license giving or granting to any person or persons, corporation or corporations, the right or privilege to erect, construct, operate or maintain a street railway, electric light plant or system, telegraph or telephone system within any city or town, or to use the streets or alleys of a town or city for such purpose, shall be granted or given by any city of the first or second class or by any incorporated town in this state in

any other manner or form than by ordinance passed and published in the manner hereinafter set forth.''

It will thus appear that the legislature had conferred no specific power upon the town of Englewood to enact a rate-making ordinance. The only specific power conferred upon the municipality by this section, is to grant a franchise in the form of an ordinance. There does not appear a suggestion as to a rate-making power, and no such power can be inferred. It may be conceded that as between the parties, such ordinance constituted a valid contract.

The question to be determined is as to the effect upon such a contract by the enactment of the public utility law, chap. 127, Laws 1913. This act is very broad and seems to confer the absolute power to regulate, both as to rates and otherwise, all public utilities within the state, at least all such as are specified in the act, and among which are street railways.

Section 13 of the act provides:

''Section 13. All ·charges made, demanded or received by any public utility, or by any two or more public utilities, for any rate, fare, product or commodity furnished or to be furnished or any service rendered or to be rendered shall be just and reasonable. Every unjust or unreasonable charge made, demanded or received for such rate, fare, product or commodity or service, is hereby prohibited and declared unlawful.''

By section 14, the Public Utilities Commission was given the power, and it was made its duty, to adopt all necessary rates and regulations of all public utilities, as follows:

''Section 14. The power and authority is hereby vested in The Public Utilities Commission of the State of Colorado, and it is hereby made its duty to adopt all necessary rates, charges and regulations to govern and regulate all rates, charges and tariffs of every public

utility within the state as herein defined, the power to correct abuses, and prevent unjust discriminations and extortions in the rates, charges and tariffs of such public utilities of this state, and to generally supervise and regulate every public utility in this state and to do all things, whether herein specifically designated, or in addition thereto, which are necessary or convenient in the exercise of such power, and to enforce the same by the penalties provided in this act, through proper courts having jurisdiction."

Section 21 fixed the maximum rate to be charged passengers by a street railway and provides for transfers as follows:

"Section 21.  No street or interurban railroad corporation shall charge, demand or collect or receive more than five cents for one continuous ride in the same general direction within the corporate limits of any county, city or town; except upon a showing before the commission that such greater charge is justified.  Every street or interurban railroad corporation shall upon such terms as the commission shall find to be just and reasonable furnish to its passengers transfers entitling them to one continuous trip in the same general direction over and upon the portions of its lines within the same city and county, or city or town, not reached by the originating car."

Further powers were conferred upon the commission by Sec. 23 as follows:

"Section 23.  (a) Whenever the commission, after a hearing had upon its own motion or upon complaint, shall find that the rates, tolls, fares, rentals, charges or classifications, or any of them demanded, observed, charged or collected by any public utility for any service, or product or commodity, or in connection therewith, including the rates or fares for excursion or commutation tickets, or that the rules, regulations, practices, or con-

tracts, or any of them, affecting such rates, fares, tolls, rentals, charges or classifications, or any of them, are unjust, unreasonable, discriminatory, or preferential, or in any wise in violation of any provision of law, òr that such rates, fares, tolls, rentals, charges, or classifications, are insufficient, the commission shall determine the just, reasonable or sufficient, rates, fares, tolls, rentals, charges, rules, regulations, practices, or contracts to be thereafter observed, and in force, and shall fix the same by order as hereinafter provided.

(b) The commission shall have the power, upon a hearing, had upon its own motion or upon complaint, to investigate a single rate, fare, toll, rental, charge, classification, rule, regulation, contract, or practice, or any number thereof, or the entire schedule or schedules of rates, fares, tolls, rentals, charges, classifications, rules, regulations, contracts, and practices, or any thereof, of any public utility, and to establish new rates, fares, tolls, rentals, charges, classifications, rules, regulations, contracts or practices, or schedule, or schedules, in lieu thereof.''

From the sections quoted, and from other provisions of the act, it fully appears that the legislature intended to delegate to the Public Utilities Commission the administration, supervision, and regulation, of all service rendered to the public throughout the state, including municipalities. Rates and regulations fixed by contract are specifically included within the powers of the commission.

From what has been said it will be seen that' the town of Englewood had no express authority to fix a rate of fare, so as to limit or prohibit the assumption of such power by the legislature.

. The uniform rule in this respect was stated in Home Telegraph Co. v. Los Angeles, 211 U. S. 265, 53 L. Ed. 176, 29 Sup. Ct. 50, to be:

"It has been settled by this court that the State may authorize one of its municipal corporations to establish by an inviolable contract the rates to be charged by a public service corporation (or natural person) for a definite term, not grossly unreasonable in point of time, and that the effect of such a contract is to suspend, during the life of the contract, the governmental power of fixing and regulating the rates. *Detroit v. Detroit Citizens' St. Ry. Co.,* 184 U. S. 368, 382, [46 L. Ed. 592, 22 Sup. Ct. 520]; *Vicksburg v. Vicksburg Water Works Co.,* 206 U. S. 496, 508, [50 L. Ed. 1102, 22 Sup. Ct. 410, 6 Ann. Cas. 253]. But for the very reason that such a contract has the effect of extinguishing *pro tanto* an undoubted power of government, both its existence and the authority to make it, most clearly and unmistakably appear, and all doubts must be resolved in favor of the continuance of the power. *Providence Bank v. Billings,* 4 Pet. 514, 561, [7 L. Ed. 939]; *Railroad Commission Cases,* 116 U. S. 307, 325, [29 L. Ed. 636, 6 Sup. Ct. 334, 388, 1191]; *Vicksburg, etc., Railroad Co. v. Dennis,* 116 U. S. 665; *Freeport Water Co. v. Freeport City,* 180 U. S. 587, 599, 611, [45 L. Ed. 679, 21 Sup. Ct. 493]; *Stanislaus County v. San Joaquin C. & I. Co.,* 192 U. S. 201, 211, [48 L. Ed. 406, 24 Sup. Ct. 241]; *Metropolitan Street Ry. Co. v. New York,* 199 U. S. 1, [50 L. Ed. 65, 25 Sup. Ct. 705, 4 Ann. Cas. 381]. And see *Water, Light and Gas Co. v. Hutchinson,* 207 U. S. 385, [52 L. Ed. 257, 28 Sup. Ct. 135]."

In *Freeport Water Co. v. Freeport, supra,* it is said:

"This power of regulation is a power of government, continuing in its nature; and if it can be bargained away at all, it can only be by words of positive grant, or something which is in law equivalent. If there is reasonable doubt, it must be resolved in favor of the existence of the power. In the words of Chief Justice Marshall in *Providence Bank v. Billings,* 4 Pet. 514, 561, 7 L. Ed. 939,

955, 'Its abandonment ought not to be presumed in a case in which the deliberate purpose of the state to abandon it does not appear.' "

In the well considered case of *Benwood v. Public Service Commission,* 75 W. Va. 127, 83 S. E. 295, and reported in L. R. A. 1915C 261, it was said:

"But the city of Benwood says it had the right given it by the legislative charter to 'contract and be contracted with.' True this general provision usually found in municipal charters is in the charter of the city of Benwood. But that provision cannot be construed as delegating beyond legislative control, the power to fix public service rates. For, as we have seen, the presumption is against such delegation of the power. The delegation 'must clearly and unmistakably appear.' It does not so appear in the general provision, merely to contract and be contracted with."

And further: "We do not say that the contract as to rates contained in the franchise was not good as between the water company and the city as long as the legislature did not exercise its superior and supreme power over the subject of the rates. From the general powers to establish waterworks and to contract and be contracted with, impliedly the city had the power to contract in the matter of rates for water furnished the public as long as the legislature did not exercise its reserved power in that particular. But that implied power was inferior to the reserved power. It was subject to the right of the legislature to prescribe different rates at any time. The legislature, not having expressly delegated to the city power by which it could inviolably agree as to the rates, could exercise power in that particular regardless of the franchise provisions. It had withheld supreme power unto itself. Neither by the charter nor by subsequent legislation did it delegate to the city of

Benwood authority to agree unalterably as to the rates for a stipulated period.

The water company and the city in the making of the so-called franchise contract were bound by cognizance of the fact that their dealings were subject to future exercise of the legislature's power over rates for water furnished the general public in the locality. Hence, the franchise was made subject to what the legislature might thereafter do as to the rates dealt with by the franchise. It was subject to the legislature's making use of the inherent power reserved, and not exclusively delegated to the city of Benwood, to supervise all public service charges. And when the legislature in its wisdom saw fit to exercise its reserved power of supervision over the matter of public service rates, by the creation of the Public Service Commission and the delegation of the power to the Commission in that behalf, the rates mentioned in the franchise became subject to supervision and regulation by the Public Service Commission. The legislature had withheld the exercise of its power over these rates until that time. It could use the power when it pleased. No length of nonuser affected the state's right thereto. *Chicago, B. & Q. R. Co. v. Iowa, (Chicago, B. & Q. R. Co. v. Cutts)*, 94 U. S. 155, 24 L. Ed. 94.''

It was further held in that case: ''It is most earnestly insisted on behalf of the city that the contract is inviolable, and that to uphold the powers of the Public Service Commission to the extent of allowing the Commission to change the rates would in effect abrogate the contract, contrary to constitutional inhibition against the enactment of any law impairing the obligation of a contract. In the light of what we have said, this position cannot be sustained. Nothing that was binding in the contract will be impaired. By it the state was not bound. The contract related to a subject-matter belonging to the state. The state had not given the city the power or

agency to contract away its right thereto for a given time. The contract, having been entered into without express legislative authority, was permissive only. It was conditioned upon the exercise of the sovereign power over the subject-matter. All this the parties to the contract were bound to know when they entered into it. There can be no impairment of the contract by the act of the state in claiming its own, when it is not bound by the contract. The supervision and regulation of the rates by the state, through the Public Service Commission, do not take from either of the parties to the contract any right which they had thereunder. Such supervision and regulation do not therefore impair the obligation of a contract. *Home Telep. & Teleg. Co. v. Los Angeles, supra; State ex rel. Webster v. Superior Court,* 67 Wash. 37, 120 Pac. 861, Ann. Cas. 1913D, 78, [L. R. A. 1915C, 287]; *Knoxville Water Co. v. Knoxville,* 189 U. S. 434, 23 Sup. Ct. 531, 47 L. Ed. 887; *Louisville & N. R. Co. v. Mottley,* 219 U. S. 467, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671; *Wyandotte County Gas Co. v. Kansas,* 231 U. S. 622, 34 Sup. Ct. 226, 58 L. Ed. 404; *Dawson v. Dawson Teleph. Co.,* 137 Ga. 62, 72 S. E. 508.''

The doctrine announced in that case is a fair statement of the overwhelming weight of judicial opinion.

The case of *State ex rel. Webster v. Superior Court,* 67 Wash. 37, 120 Pac. 861, Ann. Cas. 1913D, 78, and also reported in L. R. A. 1915C, p. 287, contains an exhaustive review of the authorities on this subject. See also *Milwaukee Electric Ry. Light & Power Co. v. Railroad Comm.,* 238 U. S. 174, 59 L. Ed. 1254, 35 Sup. Ct. 820. This doctrine has been recognized by this court in the case of *Wolverton v. Mountain States Tel. Co.,* 58 Colo. 58, 142 Pac. 165, Ann. Cas. 1916C, 776, wherein it was said:

''And it is now held that even in case of such contracts with public utilities for specific rates and for defi-

nite periods of time, these are subject to legislative acts of regulation. *Louisville & Nashville Ry. Co. v. Mottley,* 219 U. S. 467, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671, 31 Sup. Ct. 265; *Southern Wire Co. v. St. Louis, &c., Co.,* 38 Mo. App. 111.''

We must hold therefore, that at the time of the adoption of the ordinance in question, the town of Englewood was without express legislative power to fix rates or regulations for public utilities and that its contract with the defendant company, was subject to the legislative power afterward asserted, by the enactment of the Public Utilities Statute.

It follows therefore, that the power to regulate the rates of the public utility in question, is vested by the act exclusively in the Public Utilities Commission. The law fully provides that every order or decision made by the commission, may be reviewed by the Supreme Court, upon the application of either party, or of any person pecuniarly interested in the utility, for the purpose of having the lawfulness of the order or revision determined.

Hence, and for the reasons stated, the plaintiff below had, by reason of the Public Utility Act, a plain, speedy and adequate remedy at law for the determination of its grievance.

It will be noted that the town, now City of Englewood, is a municipality deriving its municipal powers from legislative grant. Whether or not the rule here announced may be applied in the case of an ordinance by a municipality operating under art. XX of the Constitution, and conducting its municipal affairs under constitutional powers and limitations, without the intervention of legislative acts, is a different and more difficult question, which we do not determine.

The judgment is reversed with instructions to dismiss the proceeding.

*En banc.*

GABBERT, C. J., and TELLER, J., dissent.

CHIEF JUSTICE GABBERT dissenting:

The majority opinion is based upon three propositions: First. That by the Public Utilities Act power is conferred upon the Public Utilities Commission to change the rates for carrying passengers fixed by contract. Second. That the railway company having filed with the Commission its schedule of rates, which were not suspended by the Commission, upon its own motion or upon the complaint of others for thirty days, the same became effective; and Third. That by the act in question the city has a plain, speedy and adequate remedy at law by a proceeding before the Commission. From each of these I dissent.

1. It is said specific power is not conferred upon the City of Englewood to enact a rate-making ordinance, and therefore rates fixed by the ordinance granting the railway company a license to construct and maintain a street railway upon its streets may be changed by the Utilities Commission. In the first place the question of rates for transportation over the line of the railway company is not involved, and in the second place express power is conferred upon the city to fix rates which may be charged by a street railway company to which a franchise is granted. The provisions of the ordinance which the railway company seeks to be relieved from does not relate to rates which it may charge for transportation over its own line, but to the provision whereby it was required to sell coupon tickets which would entitle persons taking a car going north from a specified point to passage on the line of the Denver City Tramway Company into the City of Denver, and also entitle persons going south on the cars of the Tramway Company to be transported over the line of the railway company to a street

designated in the City of Englewood. This is in no sense a charge for transportation over the line of the railway company. The fare over its line has always been five cents, and its effort is not to increase or change rates, but to be relieved from its contract, whereby it was required to furnish transportation over the line of the Tramway Company in the instances named. But conceding, for the sake of argument, that rates are involved, the cases cited in support of the proposition that authority is not conferred upon the City of Englewood to fix rates are not in point. Our statutes and the Constitution confer upon the city the power to fix rates as a condition upon which a franchise to operate a street railway over its streets is granted. Section 6676, Revised Statutes 1908, quoted in the majority opinion, must be read in connection with the section following, whereby it is provided that a corporation desiring to secure a franchise from a city or incorporated town must publish a notice of its intention to apply to the corporate authorities for the passage of an ordinance granting such franchise, which notice must specify the terms upon which such franchise is desired. This means that the franchise can only be granted upon terms, and necessarily confers upon the municipal authorities the express power to contract with the corporation seeking the franchise, by specifying the terms upon which it is granted. So that when a corporation accepts a franchise imposing terms, it thereby enters into a contract the municipal authorities are authorized to make, which cannot be abrogated by any act of the legislature that would impair the obligation of such contract. In addition, we have a constitutional provision, section 11 of article XV, which provides: "No street railroad shall be constructed within any city, town or incorporated village without the consent of the local authorities having control of the street or highway proposed to be occupied by such street railroad." From

this provision it follows that when a street railway cannot be constructed over the streets of a city without the consent of the municipal authorities, the latter have the express power to specify the terms and conditions upon which it may be constructed and maintained.

2.   Conceding that power is vested in the Utilities Commission to change a rate fixed by contract, this cannot be accomplished in the manner attempted by the railway company, i. e., by posting notice of such change with the Commission.  A change in a contract rate can only be made by a utility corporation making application to the Commission for such change, on notice to the parties interested, after a hearing whereby all parties are afforded an opportunity to be heard and a change allowed by an express order of the Commission to that effect.

3.   The act does not require the city to apply to the Commission to have its contract with the railway company enforced.  It has never been modified.  It is in full force and effect, and the only remedy open to the city is by an action in the District Court to compel the railway company to comply with the terms of its contract.

The result of the conclusion announced by the majority opinion is sufficient to demonstrate without further argument that it is wrong.  The railway company was granted the privilege of occupying the street of the city upon terms which it now refuses to comply and yet continues to occupy the street.  One of the considerations which moved the municipal authorities to grant a franchise to the railway company has been taken away and it is permitted to exercise a privilege which it must be conclusively presumed would never have been granted except for such consideration.

The judgment of the District Court should be affirmed.

Mr. Justice Teller concurs in this opinion.

Decided July 3, A. D. 1916.  Rehearing denied December 4, A. D. 1916.