[No. 16011. Department Two. January 7, 1921.]

THE STATE OF WASHINGTON, *on the Relation of the City of Seattle, Respondent,* v. SEATTLE & RAINIER VALLEY RAILWAY COMPANY, *Appellant.*[1]

MUNICIPAL CORPORATIONS (311, 360)—STREET RAILROADS (1-1)—FRANCHISES AND PRIVILEGES—ABROGATION—PUBLIC SERVICE COMMISSION. The Public Service Commission Act of 1911 does not abrogate a franchise ordinance passed prior to the Public Service Commission Act of 1911 granting the predecessors in interest of the appellant the right to operate street railway lines upon certain streets in the city in part consideration of which the street railway company was required to carry city policemen and firemen in uniform free while in the discharge of their official duties; the legislature having vested the city with the whole of the state's police power touching the subject-matter which has not been interfered with by the public service commission law.

Appeal from a judgment of the superior court for King county, Ronald, J., entered February 9, 1920, upon findings in favor of the plaintiff, in an action for a writ of mandate, tried on the merits to the court. Affirmed.

*Donworth, Todd & Higgins (Hyman Zettler,* of counsel), for appellant.

*Walter F. Meier, Thomas J. L. Kennedy,* and *A. C. Van Soelen,* for respondent.

MITCHELL, J.—This appeal, by the Seattle & Rainier Valley Railway Company, is prosecuted from a judgment of the superior court of King county, directing the

[1]Reported in 194 Pac. 820.

issuance of a peremptory writ of mandate compelling the appellant to comply with the provisions of its franchises requiring it to transport, free of charge, upon its street railways within the city of Seattle, policemen and firemen in uniform, while engaged in the discharge of their official duties. No exceptions were taken to the findings made by the court upon the trial of the case. From these findings, it appears that, prior to the effective date of the public service commission law of 1911, the city of Seattle, by its franchise ordinances, granted to the predecessors in interest of the appellant the right to operate street railway lines upon certain streets in the city; that, in the terms and conditions contained in the franchises granted to the grantees therein named, their successors and assigns, there was a provision, as a part of the consideration for the use of the streets, requiring the holders of the franchises to carry city policemen and firemen in uniform free over their street railway lines while in the discharge of their official duties; that this provision is a valuable undertaking on the part of the franchise holders, in behalf of the city, and if not enforced, will work great hardship upon, and require the expenditure of large sums of money, by the city for the carrying of its policemen and firemen over the street railways in the discharge of their several duties; and that the city has paid and is paying for such transportation by granting and permitting the franchise holders the use of its streets.

Other findings are to the effect, that, pursuant to the franchise grants, the grantees and their successors and assigns, including the Seattle & Rainier Valley Railway Company, have at all times since occupied the public streets of the city, and maintained and operated thereon street railway lines; and in compliance with the terms of the franchises, as rental for the use of the

streets, did transport city policemen and firemen in uniform until the 17th day of November, 1919. And further, that, on the 18th day of October, 1919, the Seattle & Rainier Valley Railway Company sought to avoid its franchise obligations to the city by filing with the public service commission a new tariff containing the statement as follows:

"Under certain tariffs heretofore filed and specifically under Passenger Tariff No. 2, in paragraph No. 7, the provision therein contained for carrying policemen and firemen free, is hereby eliminated and hereafter the Seattle policemen and firemen, whether in full uniform or not, will be charged the regular adult fare";

and that, upon the expiration of thirty days, without any hearing before the commission, or at all, set up the claim that the franchise provision had been canceled, and thereupon refused to comply with that provision, all without the consent of the city, and has at all times since refused to comply therewith in spite of the written demand of the city.

No contention is made that the city, which is a city of the first class, was not acting within its rights and power, at the date of the franchise grants, in incorporating therein, as a valid and enforcible obligation, the requirement that the grantees, their successors and assigns should carry policemen and firemen free.

Counsel for appellant say there is only one question in this case, viz: Did the public service commission have jurisdiction over this franchise provision relating to the fares of policemen and firemen? To put it more fully, if possible, the controlling query is, Did the enactment of the public service commission law of 1911 supersede the right of the city to insist upon the enforcement of its rights under the terms of franchise ordinances passed by the city and accepted by the

grantees prior to the going into effect of that law, requiring the grantees, their successors and assigns, to carry free the city's policemen and firemen when engaged in their respective official duties?

To sustain the affirmative of the proposition contained in the inquiry, appellant calls attention to a long list of authorities, of which the Indiana case of *Winfield v. Public Service Commission,* 187 Ind. 53, 118 N. E. 531, is fairly typical. In that case, the city of Logansport had granted a franchise to a telephone company in which it was provided that certain municipal officers should have free telephones for public business. For over ten years, the company complied with the requirement, when, after the passage of the public service commission act of that state, the company secured the consent of the commission to an abrogation of this franchise provision. Before dealing with the narrow question of whether the commission had power to order a charge to be made against the city for the telephones stipulated to be free by the franchise contract, the court reviewed the authorities as to the general principles involved, and reached the conclusion, viz:

"Except where the state has thus irrevocably, either directly or indirectly, divested itself of the right to so exercise its police power, the state may, for the public good, regulate the acts and conduct of the public service companies, and the most frequent call for such regulation relates to charges of such companies for their public service; the principle underlying such regulation being that the charges for services shall be fair and reasonable, all things considered, and that the rate fixed shall not be so low as to deprive the company of means of adequate service, nor so high as to unduly burden the public.

"Every charter granted by the state, and every franchise, whether granted by the state directly or by the municipality acting as agent of the state, is granted in

view of the rules above stated, and especially in contemplation of the fact that unless the state has in the charter to the utility company, or in the authority to its agent, or by ratification, abandoned its power to so regulate, the state's power is, by implication written into such contract; and therefore the state's act of regulation, within the limits above stated, is not an impairment of the contract, but rather an exercise of a right provided in the contract."

The court then proceeded to examine the statutes of that state to see if the state had abandoned its power of supervision over the subject, and expressed its view thereon as follows:

"We hold, therefore, that, in so far as the public interests are involved, nothing in the charter of the defendant telephone company, nothing in the powers granted to the city, and nothing in the franchise contract between the city and the defendant telephone company, prevents the state from regulating rates, including the matter of compensation to the city."

It was held the commission had power to make the order complained of. It is claimed by the appellant that the Indiana public service commission act is identical with ours, so far as the question involved at bar is concerned, and that the decision is directly in point. But, the similarity of the public service commission act of that state to the public service commission law of this state does not, of itself, make that decision directly in point or entirely persuasive in the present case. In that case, the court necessarily examined not only the public service commission act, but also the statutes conferring powers upon cities, to ascertain if the state had thereby, through the cities as its agents, abandoned the state's important function of supervision over rates and charges. For, said the court, every franchise, whether granted by the state directly or by the munici-

pality acting as agent of the state, is granted in con-
templation of the fact that, unless the state has, in its
charter to the utility company, *or in the authority of its
agent,* or by ratification, abandoned its power to regu-
late, the state's power is, by implication, written into
the contract. And, after making a complete examination
of all such statutes of that state, the court, as already
stated, concluded, among other things, that nothing in
the powers granted to the city "prevents the state from
regulating rates including the matter of compensation
to the city."

The same may be said of the case of *Sandpoint W. &
L. Co. v. City of Sandpoint,* 31 Idaho 498, 173 Pac. 972,
cited and relied on by the appellant. The issue in that
case related to the authority of the utilities commission
to revoke the right of the city to receive water for
street sprinkling free of charge under the franchise.
It was decided the commission had such power. In dis-
cussing the issue, reference was made to the doctrine
that the power to supervise and regulate rates and
charges by public utilities is an inherent function of
government, which occupies a large space within the
domain of the police power of the state. Then, consid-
ering the question of the abrogation by the state for a
limited period of its right to exercise this power, cer-
tain provisions of the constitution of that state were
cited to suggest the question if the constitution does
not contain a limitation upon the legislature, or any of
its agencies, to contract in any manner and at any time
to suspend the right of the state to exercise its police
power in such cases. In this connection, however, the
opinion reads:

"But, without considering that question, our atten-
tion has not been called to any attempt upon the part
of the legislature of this state to authorize municipali-

ties to enter into contracts which will in any manner abridge this power of the state. The franchise must therefore be held to have been granted and accepted subject to the right of the state any time to exercise its reserved police power in the matter of regulating rates.''

It follows, therefore, by the careful course pursued in those cases relied on by the appellant, that, in answering the question in the present case, we must consider, not only the public service commission law of this state, but the statutes conferring powers upon cities as well, to see if the state has previously suspended its regulatory powers in respect to the particular charges in question. This court has been called upon in a number of cases to determine the power and scope of authority of the public service commission, the rights of cities under franchises which were granted to public service companies prior to the enactment of the public service commission law, and the rights and obligations of the public service companies as well as those of the general public.

Those cases dealing with the power of the commission to abrogate the provisions of such franchises have generally been divided into two classes: (1) those affecting rates or service designed in behalf of the general public, such as *State ex rel. Webster v. Superior Court,* 67 Wash. 37, 120 Pac. 861, Ann. Cas. 1913D 78, L. R. A. 1915C 287, and *State ex rel. Seattle v. Public Service Commission,* 103 Wash. 72, 173 Pac. 737; and (2) those affecting the individual pecuniary and proprietary rights of the city itself as consideration for the franchise rights granted the public service company, such as *State ex rel. Tacoma R. & P. Co. v. Public Service Commission,* 101 Wash. 601, 172 Pac. 890, and *Seattle v. Puget Sound Tr., L. & P. Co.,* 103 Wash. 41, 174 Pac. 464—the one governmental and the

other proprietary, on the part of the city. As to the latter, the kind here involved, it has been decided that the legislature intended to, and did, vest the city with the whole of the state's police power touching the subject-matter which has not been interfered with by the public service commission law. While counsel for the appellant contends otherwise, we are satisfied the cases of *State ex rel. Tacoma R. & P. Co. v. Public Service Commission,* and *Seattle v. Puget Sound Tr., L. & P. Co., supra,* are authorities that settle the question in this case.

In the *Tacoma* case, the public service commission decided it had no power to relieve the street railway company from certain of its franchise provisions which it had complained of and asked to have abrogated. The controversy was presented to this court by an application for a writ of mandate to the commission. This court said:

"The franchise provisions complained of are those requiring the street car company, the petitioner, to pave between its tracks and one foot on either side, to contribute to the cost of bridges, to pay a certain percentage of its gross earnings to the city, and to permit certain officers or employees of the city free transportation. The franchises containing these provisions were all granted prior to the passage of the public service commission law."

The opinion takes notice of the statute granting power to cities of the first class (which need not be repeated here) and holds

"Here is a clear and specific grant by the state to the city to impose terms and conditions upon which any of its streets may be used by a street railway."

It was claimed, however, by the company, that, this being a matter within the police power, the state had the right, by a subsequent statute, to confer upon the

public service commission the power to abrogate such franchise provisions, and had in fact done so by the public service commission law. The court then examined and analyzed the public service commission law, and indeed the history of that law as it passed through the legislature, and decided there is nothing in the law which, either expressly or by necessary implication, confers power upon the commission to deal with the question of franchises or to modify the terms previously imposed therein; and that the history of the legislation indicates an affirmative intention on the part of the legislature not to confer such power upon the public service commission. The result was a denial of the writ prayed for.

In the *Seattle* case, the city sued the street railway company to recover two per cent on the gross receipts from the operation of its street railway, as provided for in its franchises. The opinion says:

"The question here is whether the public service commission law, either by its terms or by necessary implication, attempted to confer power upon the public service commission to modify or abrogate franchise provisions which had theretofore been imposed by the city in granting the franchises under the specific grant of the legislature."

The statutes were again examined and discussed, and reference, with approval, was made to the decision in the *Tacoma* case. The decision was in favor of the city.

Counsel for appellant, disagreeing with this view, seeks to distinguish the present case from the two cases just referred to, and indeed argues that this court has in effect done so. Reliance is had upon the case of *State ex rel. Seattle v. Public Service Commission*, 103 Wash. 72, 173 Pac. 737, which was a case wherein it was decided the commission had the power

to cancel a provision in a franchise requiring the street railway company to sell commutation tickets to the public generally. The particular thought or language in the opinion referred to by the appellant is that portion wherein, after referring to the *Tacoma* case holding there was no power in the commission to relieve the railway company from certain franchise provisions it was said: "But the provisions under consideration in that case did not relate to rates or fares as in this case." And further, certain language in the *Tacoma* case, as follows: "The right to deal with the question of rates and service is an entirely different matter from the right to grant franchises or abrogate the provisions thereof."

The language in those opinions, selected and depended upon by the appellant, must be understood in the light of the subjects to which it was directly or impliedly intended. It referred to rates, fares and service as related to the rights of the general public as distinguished from the proprietary rights of the city granting the franchises. Obviously this is so, for, in the *Tacoma* case, one of the franchise provisions immediately and directly called in question (similar to the one in the case at bar) was free transportation to certain officers and employees of the city, relief from which it was therein decided the commission was powerless to consider.

Judgment affirmed.

HOLCOMB, C. J., MOUNT, MAIN, and TOLMAN, JJ., concur.