# CITY OF ST. GEORGE v. PUBLIC UTILITIES COMMIS-SION et al.

### No. 3957.   Decided November 17, 1923.   (220 Pac. 720.)

1. MUNICIPAL CORPORATIONS—RIGHT TO REGULATE RATES FOR PUBLIC UTILITIES SERVICE CANNOT BE SURRENDERED. It is the declared policy of the state that regulation of rates for public utilities services is a governmental function which, in the absence of constitutional or statutory authority, a municipality cannot surrender or suspend by contract as to rates.[1]

2. ELECTRICITY—STATE'S RIGHT TO REGULATE RATES NOT SURRENDERED TO MUNICIPALITIES. Laws 1911, c. 120, § 206x20, declaring that the city council shall have power to provide for lighting streets and the charge therefor, does not alienate the state's power to regulate rates for public utility service, not excepting rates fixed by municipalities whether by contract or otherwise.

3. PUBLIC SERVICE COMMISSIONS—COMMISSION CAN REGULATE RATES FOR SERVICE TO CITY ITSELF. The regulation of rates for public utility service by the Commission under Public Utilities Act is not limited to rates affecting the public, as distinguished from rates intended for a municipality for its own use; municipal corporations in express terms being included in the act.

4. ELECTRICITY—COMMISSION CAN ENFORCE REGULAR RATES NOTWITHSTANDING CONTRACT FOR FREE SERVICE TO CITY WHERE CONSIDERATION WAS INADEQUATE. Where part of consideration for sale by city company of an electric plant was the furnishing of free electricity for municipal use, but the allowance on the price was inadequate consideration for such service, the Commission under authority of Comp. Laws 1917, § 4787, as to carrying out a contract for free or reduced rate for public utility service founded on adequate consideration, can enforce regular rates, allowing a credit for the actual consideration in reduced price.

5. PUBLIC SERVICE COMMISSIONS—STATE NOT PROHIBITED FROM REGU-

[1] *Brummitt* v. *Waterworks Co.*, 33 Utah, 289, 93 Pac. 829; *Salt Lake City* v. *Utah L. & Tr. Co.*, 52 Utah, 210, 173 Pac. 556, 3 A. L. R. 715; *U. S. Smelting Ref. & Min. Co.* v. *Utah, P. & L. Co.*, 58 Utah, 168, 197 Pac. 902; *U. S. Fuel Co.* v. *Utah P. & L. Co.*, 58 Utah, 165, 197 Pac 912; *Utah Hotel Co.* v. *Public Utilities Commission*, 59 Utah, 389, 204 Pac. 511.

LATING RATES FOR CITY HAVING CONTRACT FOR FREE SERVICE.
Const. art. 6, §§ 27, 29, denying to the Legislature power to re-
lease the obligation of any person or corporation to a city, or
to delegate power to interfere with any municipal property,
does not prevent the state from enforcing its governmental
functions to regulate rates for public utility service for a city,
though it have a contract for free service.

6. PUBLIC SERVICE COMMISSIONS—NO REVIEW WHERE RATES FIXED
NOT UNREASONABLE OR DISCRIMINATING. The Commission hav-
ing in fixing rates for public utility service acted in accordance
with the powers conferred on it by Public Utilities Act, and its
rates not being unreasonable or discriminatory, its action can-
not be interfered with.
GIDEON, J., dissenting in part.

Original proceeding by the City of St. George against the
Public Utilities Commission of Utah and another to review
orders of the Commission.

ORDERS SUSTAINED AND AFFIRMED.

*Cheney, Jensen, Holman & Stephens,* of Salt Lake City,
for plaintiff.

*Harvey H. Cluff,* Atty. Gen., for defendant Public Service
Commission.

*D. H. Morris,* of St. George, and *Dickson, Ellis & Adam-
son,* of Salt Lake City, for defendant Dixie Power Co.

FRICK, J.

The city of St. George, hereinafter called plaintiff, pursuant
to the provisions of our Public Utilities Act (Comp. Laws
1917, § 4775 et seq.), made application to this court for a
writ of review for the purpose of having reviewed certain
orders made by the Public Utilities Commission of this state,
hereinafter called Commission.

The record upon which this application is based shows that
in August, 1921, the Dixie Power Company, hereinafter called

company, a corporation organized for the purpose of furnishing electrical energy for power and lighting purposes, made application to the Commission for permission to increase its rates for electrical energy as indicated by new schedules then filed with the Commission. The increase in rates as proposed by the company would affect the plaintiff as well as its inhabitants, and it also affected the surrounding towns and communities and the inhabitants thereof. A hearing was therefore ordered upon the company's application, and after such hearing was had the Commission made an order allowing the company to increase its rates for electrical service in certain particulars which resulted in certain modifications in a certain contract existing between the plaintiff and said company respecting the furnishing of free light for street lighting by the company to the plaintiff.

No complaint is made in this proceeding respecting the reasonableness of the rates as fixed by the order of the Commission.

After the order aforesaid was made, upon the application of the plaintiff a rehearing was had by the Commission, at which the order allowing an increase of rates was affirmed, but the Commission made an additional order in which the plaintiff was allowed a credit to the amount of $9,907 as compensation for its loss of free lights under the existing contract between it and the company.

It further appears from the record that in 1916 the plaintiff was the owner of a power and light plant which it operated; that at that time one A. L. Woodhouse offered to purchase said plant, with the appurtenances thereof from the plaintiff for the sum of $13,500, which sum was subsequently reduced to the sum of $12,000; that the sale of the power plant was effectuated for said $12,000, and pursuant thereto a contract was entered into between the plaintiff and said Woodhouse in which, among other things, stating it in counsel's language in their brief, it was agreed:

(1) "That neither of said parties nor their heirs nor assigns would ever charge during the term agreed upon by said parties and said city of St. George, to wit, a term of 25 years from said October 18, 1916, for electrical energy furnished to the inhabitants of the city

of St. George, rates exceeding the following:    (Schedule of rates attached.)"

(2) "That the said parties and their heirs and assigns would furnish free of charge to said City of St. George during said period of 25 years, 15 K. W. H. or 20 H. P. electrical energy for the operation of its street lighting or for other strictly municipal service."

The contract, by its terms, was made binding upon the heirs, successors, and assigns of said Woodhouse. The company, subsequently, and before the application for an increase of rates was made as hereinbefore stated, succeeded to all the rights of Woodhouse under said contract and became bound by all its terms and conditions.

Plaintiff had erected a power plant pursuant to the authority of the provisions found in chapter 120, §§ 206x20 and 206x87, Laws Utah 1911, and had sold the same under the authority of and pursuant to the provisions of chapter 69, Laws Utah 1913.

We remark that in view that plaintiff was the owner of the plant it perhaps had the right to sell the same without the authority conferred in the later act.

Section 206x20 of chapter 120, Laws Utah 1911, by authority of which plaintiff erected its power plant, reads as follows:

Section 206. "The city council shall have the powers. * * *"

Section 206x20. "To provide for the lighting of streets, laying down of gas pipes, and erection of lamp posts; to regulate the sale and use of gas, natural gas, and electric or other lights, and electric power, the charge therefor, and the rent of meters within the city, and to regulate the inspection thereof; to prohibit or regulate the erection of telegraph, telephone, or electric wire poles, in the public grounds, streets, or alleys, and the placing of wires thereon; and to require the removal from the public grounds, streets, or alleys, of any or all such poles, and the placing underground of any or all telegraph, telephone, or electric wires."

Section 206x87 aforesaid merely contains general provisions respecting the passage of ordinances by the cities of this state for the purpose of effectuating the general powers conferred upon them and has no special bearing here.

On behalf of plaintiff it is vigorously contended that the Legislature, in adopting section 206x20, supra, had divested itself and the state of Utah of the right to interfere with the rights of the plaintiff under the contract aforesaid respecting

the furnishing free of charge any ''electrical energy for the operation of its street lighting or for other strictly municipal service,'' as provided in said contract. In support of that contention counsel cite and rely on *Vicksburg* v. *Vicksburg Water Co.,* 206 U. S. 496, 27 Sup. Ct. 762, 51 L. Ed. 1155; *Los Angeles* v. *Los Angeles City Water Co.,* 177 U. S. 558, 20 Sup. Ct. 736, 44 L. Ed. 886; *Walla Walla* v. *Walla Walla Water Co.,* 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341; *New Orleans Waterworks Co.* v. *Rivers,* 115 U. S. 674, 6 Sup. Ct. 273, 29 L. Ed. 525; and *Freeport Water Co.* v. *Freeport,* 180 U. S. 587, 21 Sup. Ct. 493, 45 L. Ed. 679.

It is true that in those cases it is held that the right to exercise the governmental function of regulation may be surrendered by the state to the municipalities, and in case it has thus surrendered its powers, contracts entered into by and with the municipalities respecting rates for water, light, and other service, will be enforced notwithstanding a subsequent attempt by the state to regulate rates. It is, however, made quite clear in the opinions in those cases that the contracts referred to will not be enforced unless the state has in express terms, or by unavoidable implication, surrendered to the municipalities its right to govern in such matters. In referring to this subject, the court, in *Freeport Water Co.* v. *Freeport,* supra, said:

'We do not mean to say that if it was the declared policy of the state that the power of alienation of a governmental function did not exist, a subsequently asserted contract would not be controlled by such policy.''

In other words, if it is the policy of the state to regulate the rates for the services rendered by public utilities through the exercise of the police power, then contracts respecting rates will not prevent the state from subsequently authorizing a change in the rates stated in the contract so as to prevent them from being unfair or discriminatory on the one hand or from being unjust or confiscatory upon the other.

Moreover, it is further held in the case quoted from that if the language of the law or act by which it is claimed the state had surrendered its sovereign right be doubtful, or is open to two constructions, then ''of the two constructions that

must be adopted which is the most favorable to the public, not that one which would so tie the hands of the council that the rates could not be adjusted as justice to both parties might require at a particular time.''

In this connection it is also well to remember that there are many decisions emanating from very respectable courts of last resort in which it is held that the state can under no circumstances surrender its governmental function of regulating the rates for public utilities' service at any and all times to the end that rates shall be just and fair to all, and that no one can be permitted to obtain an advantage whether for a short or for a long period of time and whether contractual or otherwise.

Again, it has been the declared policy of this state that the regulation of rates for public utilities' service ''is a governmental function which cannot be surrendered or suspended by the city council.'' And it is further held that ''municipalities in this state cannot enter into binding contracts regarding rates for services rendered to the public for the right to regulate and fix rates cannot be surrendered in the absence of constitutional or statutory authority.'' See    1 *Brummitt* v. *Waterworks Co.,* 33 Utah, 289, 93 Pac. 829. The policy there announced has been in force in this state for more than 15 years and has been enforced by numerous recent decisions of this court. We shall here refer to the following cases only, in which the foregoing doctrine has been enforced: *Salt Lake City* v. *Utah L. & Tr. Co.,* 52 Utah, 210, 173 Pac. 556, 3 A. L. R. 715; *U. S. Smelting Ref. & Min. Co.* v. *Utah P. & L. Co.,* 58 Utah, 168, 197 Pac. 902; *United States Fuel Co.* v. *Utah P. & L. Co.,* 58 Utah, 165, 197 Pac. 912; *Utah Hotel Co.* v. *Public Utilities Comm.,* 59 Utah, 389, 204 Pac. 511.

The case of *United States Fuel Co.* v. *Utah P. & L. Co.,* supra, was, by writ of error, taken to the United States Supreme Court and was there affirmed without opinion upon the authority of prior decisions by that court, as shown in *Union Portland Cement Co.* v. *Public Utilities Commission,* 258 U. S. 609, 42 Sup. Ct. 381, 66 L. Ed. 788.

It would be a work of supererogation to refer to, or to at-

tempt to review, the other cases of this court to show that there is no decision emanating from this court in which it is intimated, much less held, that the state has to any extent or at any time surrendered its sovereign right to exercise its governmental function of regulating rates for public utility service.

Neither is there anything in section 206x20 of chapter 120, supra, that by any fair interpretation can be held to constitute an alienation of the state's right to regulate rates for public utility service, not excepting the rates fixed by municipalities, whether by contract or otherwise.

Upon the other hand, the Legislature of this state has always acted upon the theory that the police power inherent in the state has never been surrendered. That such is the case is clearly manifested in the Public Utilities Act itself and in the subsequent amendments thereof as will hereinafter appear.     **2**

It is insisted by plaintiff's counsel that the contract in question, by which plaintiff was to receive electrical energy for lighting its streets and for other municipal purposes, is foreign to the question of regulating rates under the Public Utilities Act. It is contended that the regulation of rates for public utility service is limited to rates affecting the public as contradistinguished from rates that are intended for a municipality for its own use as such. In support of their contention counsel cite *People* v. *Public Service Com.,* 225 N. Y. 216, 121 N. E. 777. In that decision it is said that a distinction exists "between a contract made by a gas company to furnish the municipality itself with light and the terms and conditions upon which a municipality grants a franchise to furnish gas to its inhabitants. In the first instance the arrangement may be a contract pure and simple protected by the Constitution both federal and state from subsequent abrogation even by the Legislature unless such power be reserved. Such was the case of *Kings County Lighting Company* v. *City of New York* (176 App. Div. 175, aff'd 221 N. Y. 500)."

See, also, *Kings County Lighting Co.* v. *City of New York,*

176 App. Div. 175, 162 N. Y. Supp. 581, where the contract referred to in the foregoing decision is set forth in full.

An examination of the decision in that case, however, discloses that it could have no application here in view of the policy and laws of this state. The New York decision is based upon a contract to supply the town of New Utrecht with gas by a gas company. The town was subsequently annexed to and became a part of the city of New York, which succeeded to all the rights and assumed all the liabilities of the contract that existed between the town of New Utrecht and the gas company. Subsequent to such annexation, the Legislature of New York passed a special act by which the price of gas furnished to New York City from any source was limited to 75 cents per 1,000 cubic feet, which was less than the price fixed in the contract entered into between the town of New Utrecht and the gas company. New York City then refused to pay the contract price for the gas, but offered to pay the company only 75 cents per 1,000 cubic feet, the price fixed by the Legislature. The gas company sued to recover the contract price, and the court held that the act of the Legislature did not abrogate the price fixed in the contract. In this connection it is important to keep in mind that the Legislature of New York, in passing the law fixing the price for gas used by New York City, did not attempt to exercise the police power of the state nor to regulate the price of gas to the public generally. That such was not the nature or purpose of the law is clearly indicated by the court in the opinion referred to. The court, in referring to the nature or purpose of the legislative act, in the course of the opinion, said:

"This act touched the rights of no other consumers. In no sense was it an exercise of the police power, as it was not for the general public, but for the defendant's (New York City's) relief, standing apart from general local consumers."

In view, therefore, that the act was one merely for the benefit of New York City, the court held that in passing the act the Legislature did not intend to exercise the police power of the state and did not do so, and hence the price fixed in the contract that had existed between the town of New Utrecht

and the gas company, which was assumed by New York City, should prevail. It is perhaps needless to add that under our Constitution an attempt to fix the price for any public. utility service for one community only would be of no **3** effect since private or special laws are prohibited in this state while such is not the case in the state of New York. The New York case can therefore have no controlling influence here.

It is, however, also insisted that the Supreme Court of Washington, in the case of *State ex rel. City of Seattle* v. *Seattle & R. V. R. Co.*, 113 Wash. 684, 194 Pac. 820, 15 A. L. R. 1194, sustains the contention that contracts for free public utility service to municipalities will be upheld. In that case, however, it is merely held that the public Utilities Act of Washington does not affect the question of free public service, and that there was nothing in any law of the state of Washington that did so. That such is the holding in that case is amply confirmed by reference to the annotator's note in 15 A. L. R., supra. Moreover, if any other construction were given the decision in the Washington case just referred to, the decision would be in conflict with the decision in *State ex rel. Seattle* v. *Public Service Comm.*, 103 Wash. 72, 173 Pac. 737. That such would be the case is at least impliedly stated by the writer of the opinion in the case first cited from the Supreme Court of Washington. The Washington case, therefore, is likewise of no importance to a decision of the case at bar.

Referring, now, to our Public Utilities Act: We find nothing there which lends any color to plaintiff's contention. Upon the other hand, the act teems with provisions which lead to a contrary conclusion. For example: Municipal corporations, in express terms, are included in the act, and they are there treated precisely the same as all other corporations or persons that are affected or controlled by the act. Then, again, the question of free utility service is expressly mentioned and provided for in the act itself. Comp. Laws Utah 1917, § 4787, among other things, provides that the Commission shall not ''prevent the carrying out of contracts for free or reduced rate passenger transportation *or other public utility service*

heretofore made founded upon adequate consideration and lawful when made." (Italics ours.) The foregoing provision of the act was before this court for construction in the case of *U. S. Smelting, R. & M. Co.* v. *Utah P. & L. Co.,* supra. Without pausing now to add to the reasons there given why the majority of the court construed the foregoing provision as there appears, it must suffice to say that from events arising since that opinion was announced the writer at least is confirmed in his opinion that the construction there given to the foregoing provision of the statute is not only sound but is entirely practicable. The case at bar affords a striking example of the correctness of the foregoing statement. In the case at bar it appears that although the electrical energy furnished plaintiff under the contract is stated as being "free of charge," yet the real fact is that plaintiff paid an actual consideration for such service and the Commission allowed it the sum of $9,907 as a part of the consideration it had paid therefor. If the construction had been given the free service provision as contended for in that case, or if the provision had been held invalid as there suggested, we would now be required to hold that the plaintiff must pay the increased rates and not be entitled to any credit whatever by reason of the provisions of the contract.

In one view that might be taken, the Commission would have acted entirely within the provisions of the Utilities Act if it had permitted the company to enforce its increased rates, and, in view that the Commission found that the plaintiff had in fact paid the company for the so-called free service, had required the company to carry out the provisions of the contract respecting the furnishing of electrical energy for street lighting and other strictly municipal purposes free of charge. The Commission, however, did not pursue that course for the reason that it found that the amount paid by      4 the plaintiff for the electrical energy for the purposes aforesaid was not an adequate consideration as that term is construed in the Smelting Case, supra. The Commission, after investigation, found that while the plaintiff was entitled to credit for the amount allowed, yet that that amount was

less than the cost of the electrical energy required by the plaintiff for the service aforesaid according to the rates for such service which all others were required to pay. If, therefore, the Commission had enforced the contract strictly as written, it would have been forced to discriminate in favor of the plaintiff, which the Commission declined to do, but attempted to make a proper and equitable adjustment by allowing the plaintiff the credit hereinbefore stated.

The view that the Commission took is, impliedly at least, authorized by the decisions of this court to which reference has been made and is in accordance with the purposes of the Utilities Act. The purpose of that act is to require all those who are similarly situated to pay the same rate for public utility service to the end that all shall share the burdens of such service equally and to deter public utilities from practicing favoritism. Take this case as an example. If under plaintiff's contract which it seeks to have enforced it would obtain electrical energy for less than it cost to develop and to distribute it to the plaintiff, then other cities and communities who are less fortunately situated would necessarily have to pay for what the plaintiff receives free. While such a result often arises under ordinary contracts, such cannot be tolerated under contracts for public utility service in view of the provisions of the Public Utilities Act. It is for that reason the Public Utilities Acts are held not to be subject to existing contracts except where the sovereign has expressly or by unavoidable implication surrendered its right to interfere with existing contracts. That, as we have seen, is not the case in this jurisdiction.

It is, however, insisted that the Commission was without power to interfere with the particular provisions of plaintiff's contract for the reason that the Commission's acts are contrary to the provisions of our Constitution, namely, sections 27 and 29 of article 6. These sections reads as follows:

Section 27. "The Legislature shall have no power to release or extinguish, in whole or in part, the indebtedness, liability or obligation of any corporation or person to the state, or to any municipal corporation therein."

Section 29. "The Legislature shall not delegate to any special

commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, to levy taxes, to select a capitol site, or to perform any municipal functions."

We can see nothing in either of these sections which prevents the state from enforcing its governmental functions to regulate rates for public utility service. Section 27 clearly refers to obligations which arise out of contracts other than those pertaining to public utility service. It has so often been held that it would be useless to cite the numerous authorities that, unless the sovereign has in express terms or by unavoidable implication surrendered its governmental function to regulate rates for public utility service, such surrender will be held not to exist. Moreover, where the language of an act in which it is claimed the sovereign right is surrendered is open to two constructions, that construction must prevail which upholds the right of the sovereign to regulate rates for public utility service. Constitutional provisions like, or very similar to, those contained in our Constitution are, however, found in the Constitutions of many states, and we are not aware of any decision of any court of last resort where it is held that such provisions stand in the way of the sovereign's right to regulate the rates for public utility service. Upon the other hand, there are decisions which hold the contrary. See *State* v. *Billings Gas Co.* (Mont.) 173 Pac. 799; *Public Service Comm.* v. *Helena,* 52 Mont. 527, 159 Pac. 24; *Denver & S. P. Ry. Co.* v. *City of Englewood,* 62 Colo. 229, 161 Pac. 151, 4 A. L. R. 956; *City of Pawhuska* v. *Pawhuska Oil & Gas Co.,* 250 U. S. 394, 39 Sup. Ct. 526, 63 L. Ed. 1054; Id., 64 Okl. 214, 166 Pac. 1058; *City of Durant* v. *Consumers' L. & P. Co.* (Okl. Sup.) 177 Pac. 361. See, also, McQuillin, Mun. Corp. §§ 189, 229a, 229b, 229e, where the subject is discussed at some length.

In view, therefore, that the Commission has acted in accordance with the powers conferred upon it by the Public Utilities Act, and in further view that it is not shown or even contended that the rates approved by the Commission for the public utility service here in question are unreasonable or discriminatory, we are powerless to interfere. While, as be-

fore suggested, the Commission, under the circumstances before stated, might perhaps have been justified in enforcing the provisions in the contract for free service, yet if the Commission was convinced, as it undoubtedly was, that in so doing the plaintiff would receive an advantage over other cities and communities similarly situated by being required to pay less for a public utility service, the Commission was amply justified in modifying that provision of the contract as was done.

Nor is the fact important that we, or any one else, might arrive at a different conclusion so long as the orders of the Commission are neither unreasonable nor discriminatory.

In view of what has been said, therefore, it follows that the orders of the Commission should be, and they accordingly are, sustained and affirmed at plaintiff's cost.

WEBER, C. J., and THURMAN and CHERRY, JJ., concur.

GIDEON, J. (concurring). I assent to the views expressed in the court's opinion that the Public Utilities Act gives to the Commission plenary powers to fix rates to be charged for services by a public utility in this state such as the Dixie Power Company, regardless of existing contracts for such services, so long as the rates fixed are not arbitrary, unreasonable, or confiscatory. I agree with Mr. Justice FRICK in his reasoning and the conclusions reached by him respecting the sections of the Constitution quoted in the opinion and relied on by the plaintiff.

However, I consider it extremely doubtful whether the Legislature has the constitutional power to give, or whether by the Public Utilities Act it has given, or attempted to give, to the Commission any authority to adjust the rights of parties growing out of existing contracts. In other words, the Commission is authorized, in my judgment, to fix rates to be charged by the utilities of the state, and its orders are binding upon both the utilities and those receiving services. When the Commission has done that, it has reached the extent of its authority. I therefore withhold my concurrence in the holding of the court, at least inferentially expressed in

the opinion, that the Commission was acting within the scope of its authority when it fixed the amount the utility in this case was required to pay plaintiff in the nature of damages for a breach of contract or as additional compensation for the electric plant conveyed to the predecessor of the Dixie Power Company. This latter, in my opinion, is making a new contract between the parties for the purchase and sale of, property.